## SHUPPAN v. PEORIA RY. TERMINAL CO.

## McGINNIS et al. v. BIERD et al.

Circuit Court of Appeals, Seventh Circuit.
February 21, 1929.

No. 3762.

Frank T. Miller and Bruce E. Dwinell, both of Peoria, Ill., for appellees.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This appeal is from an order of the District Court disallowing a joint claim, filed with the receivers of the Peoria Railway Terminal Company by employés, for an alleged deficiency in wages.

The Peoria Railway Terminal Company operated about ten miles of railroad in and near Peoria, Ill. When released from federal control, and for some time thereafter, the company paid the wages fixed by the United States Railroad Labor Board. Operation was not profitable, and on February 17, 1921, the general manager called a meeting of the employés of the company, at which the men were told that the company was without funds and that unless expenses could be reduced further operation would be impossible. The employés were told that they must accept a horizontal cut in wages; or take the income of the company after deduction of the cost of current supplies—making no allowance for fixed charges or debts previously incurred—for apportionment among them; or seek service elsewhere.

Within a few days the employés held a meeting, at which a committee was elected. This committee, on behalf of the men, reported to the general manager that the men would not accept any one of the proposals.

On March 1 the general manager posted a bulletin which—after reciting that a meeting had been held on February 17 at which the employés had been told of the financial condition of the company, and that it had been proposed either to make a wage cut or to apportion the income of the company among the employés, and that this proposal had been rejected—announced that "beginning with the period February 16th, you will receive on each pay day your proportionate share of the current income of the Company, after allowing for the payment of current bills for fuel, current supplies, etc., and that the amount you so receive on each pay day will constitute your full and final compensation for the period covered by such pay day." The bulletin also contained assurances that this was not an attempt to break down existing wage scales, but was an emergency measure.

The employés' committee then wrote the manager, referring to the bulletin and announcing "that the rates of pay for employés of this Company are fixed by the United States Labor Board, and until such time as the Railway Labor Board may approve a change in the existing rates of pay, the undersigned employés will not accept a lesser rate of pay than that fixed by the Decision No. 2 of the Railway Labor Board."

The company then began to pay the employés as announced in the bulletin. The pay roll was made up in the usual form, and after each name was placed a sum which represented the amount that the employé would have earned in the corresponding period had the rate paid prior to February 17 continued in effect. When the income of the company for the period had been ascertained,

the ratio of the income available for wages to the total of the pay roll as calculated on the old basis was determined, and each employé paid this proportion of the amount he would have earned under the old scale. This proportion varied from 75 to 82 per cent. of what the men had been receiving. Payment was made by checks upon which was stamped, "payment in full for services in month of ———," or, "in full for services to date." Protests were made by the employés individually as the checks were accepted, and several times the employés' committee made a formal written protest to the company. This continued until August, 1922, and it is for the difference between what was paid and what would have been paid for similar services under the rates fixed in United States Railroad Labor Board Decision No. 2 that the claim is filed. Some of the parties to the claim were employed after the posting of the bulletin referred to above.

The controversy was brought before the United States Railroad Labor Board. In October, 1922, in Decision No. 1288, the Board decided that the wage reduction was in violation of the Board's Decision No. 2, and that the men were to be reimbursed for the difference between the wages they had received and those payable under the earlier decision.

It is conceded by appellants that the decisions of the Railroad Labor Board impose no legal obligations. Pennsylvania Railroad Co. v. United States Railroad Labor Board, 261 U. S. 72, 84, 43 S. Ct. 278 (67 L. Ed. 536). But it is contended that prior to February 16, 1921, the company and its employés were agreed upon the wages fixed by the Board, and that there was nothing in the subsequent events which constituted a different agreement. It is urged that the language of the bulletin manifests no intent of the company to change the terms of employment then applying.

For appellees it is urged that an agreement was implied in the continued employment after the posting of the bulletin of March 1 and the events leading thereto; and further that there was a dispute as to the amount due the employés, and when they accepted—though under protest—the checks marked "in full for services to date," whatever claim there was was satisfied.

Clearly there was no formal contract between the company and the employés that they would accept a smaller wage than they had been receiving. Looking, however, to the conduct of the parties, the conclusion is inescapable that they did so contract. At the meeting of February 17 the company through its general manager, told the employés that operation on the existing basis was no longer possible, and set forth the terms upon which operation might be continued. Offered the alternative of accepting a wage cut or leaving the service, the men reported apparently to the effect that the wage cut was not acceptable. Still, no one left the service. By remaining in the employ of the company, they manifested more positively that the proposal that they leave the service was not acceptable.

Only the company could fix the wages of those who were willing to work for it. Only the employés themselves could say for whom they would work. If either proposed terms of employment unacceptable to the other, nothing prevented the dissatisfied party from terminating the relationship. The company having made it clear what wages it would pay its employés, those who took employment with it thereafter, or those who continued in its employment, though mistaken as to the power of the company to fix wages, must be deemed thereby to have accepted the only terms upon which such continued employment was offered.

Considerable discussion is given to the fact that the bulletin of March 1, in discussing the plan of payment thereafter to be followed—that of paying a proportion of the amount calculated upon the wage rates then existing—referred to such proposed wage as a "proportion of the *amount earned*" and "proportion of *wages*." From this it is argued that the company never intended that the wages of the men should be less than the prevailing rates; but that the company proposed only that the employés should voluntarily accept a part of what they had earned, and that therefore the company remains bound to pay the earned wage. The bulletin and the reply of the employés' committee to it show this contention to be without merit.

It is unnecessary to consider the question of the effect of the employés' accepting the checks marked "in full for services to date" as constituting satisfaction of the claims.

The order of the District Court is affirmed.