## PICKETT et al. v. UNION TERMINAL CO.
### No. 248.

District Court, N. D. Texas, Dallas Division.
May 28, 1940.

246

Charles M. Hay, S. D. Flanagan, and Edwin D. Franey, all of St. Louis, Mo., and W. T. Savage, of Dallas, Tex., for plaintiff.

Robertson, Leachman, Payne, Gardere & Lancaster, of Dallas, Tex., for defendant.

ATWELL, District Judge.

The plaintiff, as agent and representative of forty-five redcaps, employees of the defendant, brings this suit for the minimum wages provided under the Act of June 25th, 1938, § 16(b), 29 U.S.C.A. § 216, subdivision (b).

He alleges that the defendant is a corporation existing by virtue of the laws of the state of Texas, and that it maintains and operates a railroad terminal, and terminal facilities, in the city of Dallas, used and necessary in the transportation of persons and property in interstate commerce.

That the redcaps, who are specifically named, and for whom he appears, in the capacity aforesaid, were employed by the defendant to handle hand-baggage, and traveling effects of passengers, and otherwise to assist passengers in their passage through said terminal. That substantially all the passengers so assisted were in transit to and among the several states of the union. That said employees are employed in interstate commerce, and their services were an essential part of the transportation of passengers and property among the said several states.

That under Section 6 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 206, it was required to pay to each of the said employees, wages of not less than twenty-five cents an hour from October 24th, 1938, to October 23rd, 1939, and not less than thirty cents an hour from and after October 24th, 1939. That notwithstanding such legal requirement it has failed and refused to pay the employees said minimum wage to the date of the filing of the suit, but has paid said employees only a small portion thereof.

It then sets out the exact number of hours that each employee worked at twenty-five cents, and the exact number of hours at thirty cents, showing the total wages earned; the exact amount paid to each employee and the balance due each; the total of such balance due being $38,626.99.

He then alleges that the amount of $38,626.99, so made up of the items mentioned, is the amount that was received in tips by the said redcaps from passengers at the defendant's terminal during the specified period.

He claims that the amount so paid by tips from passengers has never been paid by the defendant, and sues for that sum, plus the additional amount stipulated by the statute, as liquidated damages, and for the allowance by the court of a reasonable attorney's fee.

The pleading of the defendant, the stipulation of the parties, and the testimony introduced, simplify the issues.

Those issues are: (a) whether the redcaps were engaged in interstate commerce; (b) whether they were employees of the defendant; (c) whether, having received tips from passengers, in the exact unpaid amount, such tips may be considered, under the law, as having been paid in wages.

■ At argument, it was, and is now, conceded by the defendant, that the redcaps were, in truth, its employees. Such fact is clearly shown by its treatment of them, its issuance of passes to them, its rules for their guidance, its requiring them to handle bags and passengers regardless of whether they were paid therefor, by the owners of such bags, or, by such passengers, by the furnishing to them of checks which they used on baggage, and by the fact that the defendant hired and discharged them, and otherwise exerted a supervision over them which clearly demonstrated the status of employer and employee. It will be borne in mind that sub-division (g) of Section 3 of the Act, 29 U.S.C.A. § 203(g), defines "employ," to include, "to suffer or permit to work," while sub-division (e) of the same section says that "employee" includes any individual employed by an employer.

■ The next issue is equally simple. Paragraph (b) of Section 3, provides that "'commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

The stipulation and testimony indicate that about one-half of the passengers served by the redcaps are interstate; that a substantial part of the passengers are interstate; that incoming trains from other states stop at the station, and the redcaps are required to unload the baggage of the passengers thereon, from the platform of the cars and place it on the station plat-

form. They then carry it for those passengers from the station platform to the street. This they are required to do, whether they receive tips or not. If a person is old, or, sick, or, crippled, and needs a wheel chair, such chair is furnished by the defendant and the redcap wheels the chair for the use of the person, and then wheels the person in the chair either to the place of embarking, or, to the place of disembarking from and to the street, whether paid by such person or not.

The railways which own the defendant's stock, and use the terminal, are, the Texas and Pacific; the Missouri, Kansas and Texas; the Gulf, Colorado and Santa Fe; the Chicago, Rock Island and Pacific; the St. Louis and Southwestern; the Texas and New Orleans; the Frisco; and the Fort Worth and Denver. Each of these roads run from points in Texas to points outside of Texas, or have connections to and from outside the state. Their trains, so constituted, come into the terminal. The defendant has ticket offices, baggage facilities, and all of the machinery necessary for the delivery onto the trains and off of the trains, of persons and baggage so routed and traveling.

The rule which is now recognized, and which has been reiterated, is, that the test of whether an employee is engaged in interstate commerce, is whether he was so engaged, or, in work so closely related to such transportation as to be practically a part of it; whether he facilitates interstate commerce. Chicago & Northwestern Ry. Co. v. Bolle, 284 U.S. 74, 52 S.Ct. 59, 76 L.Ed. 173; Kinzell v. Chicago, M. & St. P. Ry. Co., 250 U.S. 130, 39 S.Ct. 412, 63 L.Ed. 893; Louisville & N. R. Co. v. Jollys Administratrix, 232 Ky. 702, 23 S.W.2d 564; Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310; Spaw v. Kansas City Terminal Ry. Co., 198 Mo.App. 552, 201 S.W. 927; Gus Mayer Co. v. Louisville & N. R. Co., 228 Ala. 290, 153 So. 249; Treadway v. Terminal R. R., 231 Mo.App. 1028, 84 S.W.2d 143, and Id., Mo.App., 136 S.W.2d 401; Baltimore & O. S. W. R. v. Burtch, 263 U.S. 540, 44 S.Ct. 165, 68 L.Ed. 433; Puget Sound Stevedoring Co. v. State Tax Commission, 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S. Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

There is nothing in the State of New York ex rel. Pennsylvania Ry. Co. v. Knight, 192 U.S. 21, 24 S.Ct. 202, 48 L.Ed. 325, which, upon close scrutiny, is contrary to this formidable line of recent authorities. The activities there, and the instruments, ante and post, interstate journeys, were on a different basis and in a different relation to the railway company to that disclosed in this case.

■■■ The third question is somewhat more difficult. It is more difficult because the penalty of the statute makes the burden heavy on the erring employer. Careful counsel have called the court's attention to the fact, as disclosed by the stipulation and testimony, that the redcaps who are suing here, have already received a little more than they were receiving before the law was passed. Any such considerations are not for courts. If a law is plain, unambiguous and constitutional, the court has nothing to do but speak its enforcement if and when called upon to act under it. This act has been found to be constitutional. Opp Cotton Mills v. Administrator of Wage and Hour Division, Circuit Court of Appeals, Fifth Circuit, 111 F.2d 23; citing several Supreme court cases. It was written in the interest of the employee. Its philosophy is not to limit a recovery to the minimum wage, but to guarantee such minimum wage. If betterments to the minimum wage are secured, there is nothing in the law that would strip them from the employee.

■■■ The payment of tips by the public, to the employee of another, is a gift to that employee and in the absence of any contract between the employee and employer that such tips shall be the property of the employer, they remain the property of the employee. A gratuity by the public to the employee of an employer cannot be a compliance with a plainly worded statute which requires the employer to pay the employee a certain sum.

A gift by an outsider to a servant does not discharge the debt of the master to the servant. Assuming that a master and servant may contract, which is not decided, that gifts received by servant shall be the property of the master, and used by both to liquidate a part of what the master owes the servant; is not present in this case. There is no such agreement in this case.

On October 22nd, 1938, the defendant wrote a letter to each of the redcaps in its employ, advising them that on October 24th,

the Fair Labor Standards Act would become effective, and that such tips as they received could be retained by them, and the defendant would make up the deficiency if such tips did not aggregate the minimum legal wage. Two days later, the redcaps replied, through their representative, that they could not agree to that procedure and that they intended to assert their rights under the law. Nothing was done by either side. Each continued to function as employee and employer. The status remained the same. No one was discharged and no one quit.

In December following, the defendant recognized by letter that the question of tips was an open question between it and the redcaps.

On January 1st, 1940, in a working agreement, which has been introduced in evidence, it was again recognized that the question of tips was an open one, and that it would be decided by the courts, and if decided against the defendant, it would respond.

Therefore, there was no meeting of the minds on the so-called new contract. For more than thirteen years they had been working together as heretofore indicated; the redcaps being paid entirely by tips which they received from the public, when they were paid at all. That arrangement could not be optionally terminated by one party without the consent and agreement of the other. When the offer to terminate it was made by the employer by letter, a reasonable time to accept, or, reject, was granted by the law. The answer coming within two days, it would appear that it was rejected within a reasonable time. The parties continued to act as they had theretofore acted.

The case Shuppan v. Peoria Ry. Terminal Co., 7 Cir., 30 F.2d 569, 570, can hardly be construed as persuasive in the present case. That was a short line which became financially involved, and a notice that the employees must accept a cut in wages was given. That cut was refused. Thereafter, the general manager posted a bulletin, announcing that beginning at a certain period, "you will receive on each pay-day, your proportionate share of the current income of the company, after allowing for the payment of current bills for fuel, current supplies, etc., and that the amount that you receive on each pay-day will constitute your full and final compensation for the period covered by such pay-day."

Again, the employees wrote that they expected the wages fixed by the United States Labor Board, and that they would not accept a lesser rate of pay. The company then begun to pay the employees as announced in the bulletin. The paying checks were stamped, "payment in full for services in month of ———," or, "in full for services to date." Protests were made by the employee as the check was received. This continued for about a year and a half, and sometime later, when the road was in the hands of a receiver, claims were filed by the employees for the alleged deficiency in wages.

Under that situation, the court said, "Clearly there was no formal contract between the company and the employées that they would accept a smaller wage than they had been receiving. Looking, however, to the conduct of the parties, the conclusion is inescapable that they did so contract."

The facts here disclose, as already indicated, that there was no meeting of the minds and that such openness was disclosed by the defendant's recognition of the lack of an agreement in the December following October of 1938, and again in the working agreement between the parties on January 1, 1940.

There is also a statement in the opinion which shows its inapplicability to the law, namely, "only the company could fix the wages of those who were willing to work for it." Under the present situation, the Congress has declared what the minimum wage shall be, and to that extent has superseded the right of employer and employee to fix another, or, a different amount, unless the amount be in excess of the minimum. Again, the statement that if either the employer, or, employee, were dissatisfied with the terms of employment, one so dissatisfied could terminate the relationship. Of course, that is academic, but that liberty, which was once thought academic, is now superseded by the language of this Act. The reasoner would not be considered even bold who states that an employee may agree to work for an employer for twenty cents per hour, and after such agreement bring suit and recover an amount equal to the legal minimum fixed by the Act.

The contract between the employee and his employer is worthless, so far as minimums are concerned, if such minimum is

below the legal minimum, and if the work is the work described in the Act.

■ There has been a refinement of argument, pro and con, with reference to wages and tipping. An employee who receives tips from the public, and pays them to his employer in the absence of any contract, may recover them. Zappas v. Roumeliote, 156 Iowa 709, 137 N.W. 935; Polites v. Barlin, 149 Ky. 376, 149 S.W. 828, 41 L.R.A.,N.S., 1217. See also as indicating the present trend, Statutes of California, 1913, chap. 324, p. 632, as amended.

■ Wages is the reward paid for labor; a compensation given to a hired person for his or her services. See In re Gurewitz, 2 Cir., 121 F. 982. Wage is that which is paid for work, or, service, especially for work of a manual, mechanical, or, menial kind. It differs from salary. Subdivision (m) of Section 3 of the Act, 29 U.S.C.A. § 203(m), provides that wages paid to any employee, includes the reasonable cost, as determined by the administrator, to the employer of furnishing employee with board, lodging, or, other facilities, if such board, lodging, or, other facilities are customarily furnished by such employer to his employee. The Congress thought, therefore, that that could be included as a part of the wage which it described, if and when furnished by the employer. It would be remarkable to conclude that a congressman in 1938 was not familiar with the tipping practice. The Congress did not put into the Act anything else under the head of wages which might be construed into an inclusion of tips, which might be received by an employee, as a deduction from the legal wage provided for.

■ That tips are figured under the Social Security Act, or, the Compensation Act, in some states, in addition to the paid wage, as the aggregate basis for the determination of benefits that the employee is to receive under those Acts, is no argument for including in a clear law the thought that it was intended that if an employee received a tip, while working under the Fair Standards Labor Act, his employer could deduct that amount from the minimum wage which he was bounden to pay under the law. Such a construction would be abortive and destructive. The Act uses the phrase, "shall pay," in describing the duty of the employer.

The Act also, in section 16, 29 U.S.C.A. § 216, carries criminal penalties as well as civil penalties. An Act so worded cannot be destroyed by reading into it something that is not justified.

Decree may go for the plaintiff for the amount sued for, plus liquidated damages in that amount, plus $500 attorney's fee.