**HARRISON, Grand President of Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes, et al. v. KANSAS CITY TERMINAL RY. CO. (UNITED STATES, Intervener).**

No. 608.

District Court, W. D. Missouri, W. D.
Jan. 11, 1941.

Charles M. Hay, S. D. Flanagan, and E. D. Franey, all of St. Louis, Mo., and Joe E. Burris, of Kansas City, Mo., for plaintiffs.

S. W. Sawyer, John H. Lathrop, and Horace F. Blackwell, Jr. (of Lathrop, Crane, Reynolds, Sawyer & Mersereau), all of Kansas City, Mo., for defendant.

Charles Lamkin, Jr., Asst. U. S. Atty., of Kansas City, Mo., for intervener.

OTIS, District Judge.

Whether redcaps at the Kansas City, Missouri, Union Station, who have received in tips more than the equivalent of the minimum wages provided for in the Fair Labor Standards Act, Title 29, Sec. 201 et seq., U.S.C.A., may now prevail in their contention that in addition to what they have received the defendant, the Kansas City Terminal Railway Company, as their employer, should pay them in cash minimum wages (and a further like amount as liquidated damages), is the question presented. The question is not altogether novel. A similar question (but with facts differing in a material respect) was presented to the District Court for the Northern District of Texas and decided by that court May 28, 1940, Pickett et al. v. Union Terminal Co., 33 F.Supp. 244, and to the District Court for the Southern District of Florida, which handed down its decision October 21, 1940, Williams et al. v. Jacksonville Terminal Co., 35 F.Supp. 267.

Redcaps, so called from the color of the caps they wear—the designation "ushers", which also appears in the record, perhaps is more descriptive of their functions—are, and for years have been, familiar to all who patronize the great union stations of the United States. For many years their services have been available in the Union Station in Kansas City, Missouri, which is owned and operated by defendant, the Kansas City Terminal Company, the stock in which, in turn, is owned by railroads using the facilities of the station. The Terminal Company always has hired and, when it desired to do so, discharged, redcaps. It has prescribed in great detail the nature of their duties. Those duties are complex, requiring for their intelligent discharge much information and also all the arts of diplomacy and tact. The various duties intimately are connected with the obligation of the Terminal Company and the railroads holding stock in it to the traveling public.

Prior to the effective date of the Fair Labor Standards Act the Terminal Company did not directly pay to the redcaps anything in compensation for their services. What compensation they received they received in the form of tips from travelers they aided, tips gratuitously given, tips which the redcaps were forbidden to solicit. On October 24, 1938, the Fair Labor Standards Act became effective,[1] the Terminal Company, obviously contemplating the very possibility, which now by this suit has become a reality, that it might be contended that in addition to the tips which the company permitted the redcaps to receive for their services to travelers, the redcaps also should have paid to them directly in cash by the company the minimum wages provided for in the act, the company attempted to protect itself against such an eventuality by promulgating on October 21, 1938, what is called in the record here its "Accounting and Guaranty Notice." The terms of that notice, which will be fully set out hereinafter, were accepted by the redcaps. Notwithstanding the redcaps did accept the notice and proceeded to act in accordance with its provisions, and notwithstanding they knew full well for what purpose it was put into effect, they have now brought suit against the company, through the plaintiff, whom they have designated (as the act permits, Sec. 216) as their agent or representative to maintain the action, for claimed unpaid minimum wages in a total amount of $74,197.56 and for a like amount, as is provided for in the act, as liquidated damages, and for a reasonable attorney fee for their counsel, or for a total amount of $148,395.12 and an attorney's fee.

The answer of defendant puts in issue the constitutionality of the Fair Labor Standards Act, its applicability to the redcaps (the answer denying that they are "employees" of the defendant and that they are "engaged in interstate commerce"), and the contention of plaintiff that the redcaps have not already been paid the minimum wages required by the act.

---

[1] The Act was approved June 25, 1938. It was provided in the act that it should become effective 120 days after its approval.

The Attorney General has intervened.

1. I set to one side without discussion issues raised by the pleadings which were not pressed in oral argument[2] and those which, in view of the conclusion reached, need not be discussed.[3] The question which was argued and must be dealt with is: May the tips which the redcaps received from the public during the period involved in this suit be treated as wages paid the redcaps by the defendant in determining whether the minimum wage requirement of the Fair Labor Standards Act has been complied with?

I shall consider the question with three different assumptions. 1. I shall assume that arrangement between the defendant and the redcaps which was in existence before the enactment of the Fair Labor Standards Act and the coming into being of the Accounting and Guaranty Arrangement. 2. I shall assume a certain hypothetical arrangement touching the disposition of tips. 3. I shall assume the Accounting and Guaranty Arrangement entered into between the redcaps and defendant.

### Assumption No. 1.

 It does not seem to me that any real problem is presented under Assumption No. 1. To say that, within the intention of Congress as expressed in the Fair Labor Standards Act, the defendant paid wages to redcaps when it permitted them to accept tips from travelers is to assume that Congress did not know the generally accepted meaning of simple words. But they did know the generally accepted meaning of simple words. They knew what the word "wages" means in common, present day, understanding.[4] They knew what a "tip" is. Certainly any member of Congress would have been amazed if he had been told, when he handed to the bellboy in his Washington hotel a tip, that the hotel company was paying the bellboy his wages. If Congress had intended that tips should be included in the meaning of the word "wages" it would have said so.[5] It intended that the reasonable cost of board and lodging furnished by the employer should be included and it said so. Sec. 203(m). The conclusion is that if the simple situation here assumed were that presented in this case plaintiff undoubtedly would be entitled to prevail, at least to the extent of recovering the minimum wages required to be paid.[6]

[2] Counsel for the defendant expressly stated in the oral argument that they did not contest in this case the contention that the redcaps are "employees" within the meaning of the Fair Labor Standards Act, nor that they are engaged in interstate commerce.

[3] While the question of the validity of the Fair Labor Standards Act, especially of the provision for liquidated damages, is raised and argued in briefs by the defendant, the plaintiff, and the Attorney General, as intervener, those questions are not considered in this opinion because the conclusion reached on the primary question involved makes it unnecessary to consider and pass on the question of constitutionality.

[4] In oral argument and in brief counsel for defendant learnedly and interestingly discuss the etymology of the word "wages," and the meanings of the Norman-French and Latin words through which the evolution of the word may be traced. It does not seem to me to be important to give great consideration to that matter. Members of Congress are not etymologists. They use words as they are understood today in common speech and the words they use are to be interpreted in accordance with that standard.

[5] A study of the history of the Fair Labor Standards Act makes it clear that the specific problem presented by this and similar cases was not before Congress. It is scarcely to be doubted that if the possibility that such a problem would arise had been contemplated, express language in the act would have provided for its solution. Quite an interesting discussion of this matter is to be found in No. 7, Volume 40, Columbia Law Review, page 1262.

[6] The simple situation discussed under Assumption No. 1 is that which Judge Atwell believed was presented in Pickett v. Union Terminal Company, supra. He decided that case upon the theory that no agreement of any kind had been made between the employer and the redcaps touching the application of tips to the minimum wages requirement of the Act. He said expressly that there was no agreement between the employer and the employees and intimated most strongly that such an agreement, if there had been one, would have resulted in a different decision. The opinion of Judge Waller in Williams v. Jacksonville Terminal Company, supra, also proceeds upon the theory that there was no agreement between the employer and the redcaps. Indeed, Judge Waller holds that redcaps are not "employees" within the meaning of the

### Assumption No. 2.

Defendant was under no obligation to employ redcaps. In the great majority of railway stations no such service is provided. When the defendant did employ redcaps it had the right to fix the conditions of their employment (except as Congress legally may have prescribed conditions). It had the right to say what duties they should perform, how they should perform them, when they should perform them. It had the right to say whether they should take or refuse tips when offered. It had the right to require them to turn over to it all tips received.[7] Having these several rights, clearly the defendant might have done this—and so have complied fully with the Fair Labor Standards Act—it might have paid to every redcap in cash the minimum wage required by law, reimbursing itself out of the tips turned in. If the situation thus hypothesized were that presented in this case plaintiff could not prevail.

### Assumption No. 3.

The situation actually presented is not exactly that considered under Assumption No. 1 nor exactly that considered under Assumption No. 2. It must be described fully and precisely. That, however, may be done briefly.

On October 21, 1938, defendant delivered to each redcap (and each redcap acknowledged receipt thereof in writing) the following announcement:

"Special Bulletin No. 262
"Kansas City, Mo.
"October 21, 1938.
"To Ushers of the
Kansas City Terminal Ry. Co.
Union Station.

"In view of the requirements of the Fair Labor Standards Act, effective October 24, 1938, and in consideration of your hereafter engaging in the handling of hand baggage and travelling effects of passengers or otherwise assisting them at or about stations or destinations, it will be necessary that you report daily to the undersigned the amounts received by you as tips or remuneration for such services.

"The carrier hereby guarantees to each person continuing such service after October 24, 1938, compensation which, together with and including the sums of money received as above provided, will not be less than the minimum wage provided by law.

"You are privileged to retain subject to their being credited on such guarantee all such tips or remuneration received by you except such portion thereof as may be required of you by the undersigned for taxes of any character imposed upon you by law and collectible by the undersigned.

"All the matters above referred to are subject to the right of the carrier to determine from time to time the number and identity of persons to be permitted to engage in said work and the hours to be devoted thereto, to establish rules and regulations relating to the manner, method and place of rendition of such service and the accounting required.

"Kansas City Terminal Railway Co.
"By V. I. Bell
"Station Master"

This announcement was delivered to the redcaps "in view of the requirements of the Fair Labor Standards Act," on about the day that act became effective. It required the redcaps to "report daily to the undersigned [i. e., to the defendant] the amounts received * * * as tips * * *." It guaranteed to the redcaps "compensation which * * * will not be less than the minimum wage provided by law," but ad-

---

Fair Labor Standards Act at all, although it is true that he also gives to the Fair Labor Standards Act a broader interpretation than that which Judge Atwell had given it. He holds that a wage is paid, within the meaning of the Act, if it is paid directly in cash by the employer to the employee, or if the employer has furnished to the employee facilities which enable him, the employee, to earn the wage. I do not consider it necessary to particularly discuss either of the excellent opinions of these judges, in which they reach conflicting results, since each specifically points out that the case considered by him is not such a case as that which I have found is presented here.

[7] The statement made here is not questioned but, on the contrary, is asserted by defendant and impliedly admitted by plaintiff. Cases which may be read in this connection are Gross' Case, 132 Me. 59, 166 A. 55; Sloat v. Rochester Taxicab Co., 177 App.Div. 57, 163 N.Y.S. 904; Zappas v. Roumeliote, 156 Iowa 709, 137 N.W. 935; Polites v. Barlin, 149 Ky. 376, 149 S.W. 828, 41 L.R.A.,N.S., 1217; Pickett v. Union Terminal Co., D.C., 33 F.Supp. 244. None of these cases, however, questions the accuracy of the statement made. On the contrary, each of them either expressly affirms the same idea or impliedly recognizes its truth.

vised them that the tips received by them would be included in determining their "compensation." It informed the redcaps that they were "privileged to retain subject to their being credited on such guarantees all such tips received * * * except such portion * * * as may be required of you * * * for taxes."

When the redcaps received this announcement and thereafter continued to work they impliedly accepted its terms. They consented and agreed to whatever clearly was stated in the announcement and to whatever clearly was implied in what was stated. None seriously would contend that the redcaps did not understand that the defendant intended that after October 21, 1938, tips should be counted in the calculation of minimum wages to be paid as required by the Fair Labor Standards Act. None seriously would contend that the redcaps did not understand that the defendant by its announcement asserted rights to and an interest in tips received. It did that when it required that such tips should be reported daily (no employer would require an employee to report gifts in which the employer had no interest). It did that when it specifically made it known that tips were to be included in compensation guaranteed. Especially did it do that when it advised the redcaps that they were "privileged to retain * * * tips." To grant a privilege is to assert the right to grant it. To grant the privilege of retaining tips is to assert the right to demand that they be paid over. The privilege of retaining tips was granted but the grant was not unconditional. The redcaps understood what the condition was. They understood and they accepted it. They were to retain the tips subject "to their being credited on such guarantee." On what guarantee? On the guarantee that the compensation of each redcap "will not be less than the minimum wage provided by law."

Here was an assertion by the defendant of a claim it had a right to assert, a claim to the tips received by the redcaps. Here was an arrangement by which the redcap, when he had received a tip, held it in his custody for the benefit of his employer until he had given his employer credit on his wage, after which it became his separate property.

So it appears that there is no essential distinction between the hypothetical situation discussed under Assumption No. 2 and that actually presented in this case. In each the defendant asserts its claim to tips and it has the right to do that. In each, when the redcap receives a tip, he knows it is the employer's property. In the hypothetical situation the redcap turns in the employer's tip to some agent of the employer to be thereafter used in paying the redcap's wages. In the actual situation the redcap, pursuant to understanding with his employer, keeps the employer's tip in his own custody, that it may be applied to or credited on his wages. The distinctions constitute no essential difference. Just as under Assumption No. 2, so here, plaintiff is not entitled to recover.

### Plaintiff's Argument.

In the very able brief submitted by plaintiff's counsel, which was supplemented by their equally able oral argument, they present ten contentions. I think they are entirely right in their contentions I, II, V and X, as follows: I. "The redcaps are employees of defendant for the purposes of the Fair Labor Standards Act of 1938." II. "The redcaps were engaged in commerce within the meaning of * * * the Fair Labor Standards Act of 1938." V. "In the absence of an agreement on the part of an employee to turn over his tips to his employer, tips received by the employee are the property of the employee." IX. "Under * * * the Fair Labor Standards Act of 1938, it is mandatory that the court award liquidated damages, if it should find in favor of plaintiff for wages due." Contention X, asserting that Pickett et al. v. Terminal Co., D. C., 33 F.Supp. 244, should be followed here, really is not a separate contention, but only a citation of authority.

Plaintiff's contentions III, IV, VI, VII and VIII, have to do, directly or indirectly, with that feature which is peculiar to this case, which was not present in the two similar cases which have been reported in the books. Defendant's obvious attempt to comply with the Fair Labor Standards Act by its "Accounting and Guaranty Notice," plaintiff contends, failed of its purpose. What is the argument?

The essential steps in plaintiff's argument are these. 1. In the absence of an agreement on the part of an employee to turn over his tips to his employer, tips received are the property of the employee. (Impliedly it is conceded that if there is an agreement to turn over, the tips are the employers.) 2. The so-called Accounting and

Guaranty Notice of October 21, 1938, was at best no more than an agreement that tips received by the redcaps would be considered wages for the purposes of the Fair Labor Standards Act. It was not a contract whereby the parties agreed that the tips received by the redcaps to the extent of the minimum wage prescribed by the Fair Labor Standards Act should be the property of the defendant.

Plaintiff's case then depends upon a very fine and technical distinction. While the redcaps involved, as a matter of fact, received, by reason of their employment, an amount equivalent to (and in the great majority of instances much more than) the minimum wages, their learned counsel would secure for them, in addition, twice the amount of minimum wages, because of the difference, not indeed between tweedledum and tweedledee, but between, on the one hand, "an agreement that tips received by the redcaps would be considered as wages for the purposes of the Fair Labor Standards Act" (i. e., for satisfying its minimum wages requirement) and, on the other hand, an agreement "that the tips received by the redcaps to the extent of the minimum wage prescribed by the Fair Labor Standards Act should be the property of the defendant." If plaintiff is right, what a disastrous (to defendant) result and what an undreamed of bonanza (for the redcaps) follows from a distinction the naked eye scarcely is able to detect!

Of course there is no distinction between the agreements here described, that is, no distinction from the standpoint of either of the parties to the agreements (whatever might be the distinction from the standpoint of the Professor of Contracts in the Law School). It is not possible that the redcap will be heard to say—"Yes, I agreed with the defendant that the tips I received because of my employment should be counted by my employer in satisfying the minimum wages requirement of the law, just as if I had first turned over and then had received back the tips, but I did not exactly agree to the turning over and the receiving back, and, so, now, I demand three times minimum wages?"

Plaintiff's learned counsel make a further most curious argument. Defendant, say they, could not have required the redcaps to have turned in their tips for that "would be tantamount to defendant making a charge to passengers for redcap service, and since there is no uniformity in the amount of tips, the arrangement would be in violation of Section 2 of the Interstate Commerce Act, 49 U.S.C.A. § 2, which provides that no common carrier shall directly or indirectly by any special rate, rebate, drawback or other device charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered or to be rendered in the transportation of passengers or property than it charges, demands, collects or receives from any other person or persons for doing for him or them a like service." The gist of this argument is the erroneous assumption that to require the redcaps to turn in their tips is "tantamount to making a charge to passengers for redcap service." But the tips are voluntarily given by the patrons. The redcaps themselves do not make a charge. How can that which was not a charge be converted into a charge by the act of turning over the tip?

I have not discussed all the contentions ably presented by counsel for plaintiff but those only I regard as most significant. All have been considered.

## Rulings on Objections to Testimony Taken Under Submission.

In the course of the trial certain objections to proffered testimony and to certain parts of the agreed statement of facts were taken under submission. All such objections (all were made by counsel for defendant) now are overruled.

## Findings of Fact.

I find the facts to be as stipulated by the parties in the Agreed Statement of Facts, in subdivisions I to XII, inclusive, together with all of the exhibits referred to and attached. The Agreed Statement of Facts was offered in evidence and is marked "Filed January 6, 1941, A. L. Arnold, Clerk, by Dan C. Kelliher, Deputy." By reference it is incorporated here.

## Conclusion of Law.

Upon the facts found, I conclude as a matter of law that the plaintiff is entitled to recover nothing, either as minimum wages, liquidated damages, or attorneys' fee, from the defendant.

## Judgment and Decree.

This cause coming on to be heard upon the second amended complaint, the answer of the defendant thereto, the intervention of the Attorney General, and the court having heard and considered the evidence:

and the arguments, oral and written, of counsel for the parties, and having made findings of fact and announced a conclusion of law, and being fully advised in the premises:

Now, therefore, it is ordered, adjudged and decreed that the plaintiff have and recover nothing from the defendant, and that the costs of this proceeding be assessed against plaintiff: