# WILLIAMS ET AL. v. JACKSONVILLE TERMINAL CO.*

No. 112.   Argued January 6, 1942.—Decided March 2, 1942.

*Together with No. 1023, October Term, 1940, *Pickett, General Chairman of the Brotherhood of Railway & Steamship Clerks, etc.,* v. *Union Terminal Co.,* also on writ of certiorari, 314 U. S. 701, to the Circuit Court of Appeals for the Fifth Circuit,—argued January 6, 7, 1942.

*Mr. Frank F. L'Engle* for petitioners in No. 112.

By special leave of Court, *Mr. Robert L. Stern* argued the cause for the Administrator of the Wage and Hour Division, U. S. Department of Labor, as *amicus curiae*, in No. 112; and *Solicitor General Fahy* and *Messrs. Robert L. Stern, Warner W. Gardner, Irving J. Levy,* and *John E. Skilling* were on the brief for the Administrator, as *amicus curiae*, in Nos. 112 and 1023.

*Mr. John Dickinson,* with whom *Mr. Julian Hartridge* was on the brief, for respondent in No. 112.

Mr. Charles M. Hay, with whom Messrs. S. D. Flanagan and E. D. Franey were on the brief, for petitioner in No. 1023.

Messrs. Robert G. Payne and John Dickinson argued the cause, and Mr. Payne was on the brief, for respondent in No. 1023.

MR. JUSTICE REED delivered the opinion of the Court.

The question presented by both these cases is whether a railroad company operating a terminal subject to the Railway Labor Act and the Fair Labor Standards Act of 1938 is required by those statutes, in the absence of a negotiated agreement respecting wages, to pay "redcaps" a fixed minimum hourly wage irrespective of the tips from passengers received by the redcaps, or whether an accounting and guarantee plan which leaves all tips with the redcaps and assures them that each will receive at least the minimum wage is valid.

The Fair Labor Standards Act is not intended to do away with tipping. Nor does it appear that Congress intended by the general minimum wage to give the tipping employments an earnings-preference over the non-service vocations. The petitioners do not dispute the railroad's contention that, during the entire period, each redcap received as earnings—cash pay plus tips—a sum equal to the required minimum wage. Nor is there denial of increased pay to the redcaps on account of the minimum wage guarantee of the challenged plan as compared with the former tipping system. The guarantee also betters the mischief of irregular income from tips and increases wage security. The desirability of considering tips in setting a minimum wage, that is, whether tips from the viewpoint of social welfare should be counted as part of

that legal wage, is not for judicial decision.[1]   We deal here only with the petitioners' assertion that the wages Act requires railroads to pay the redcaps the minimum wage without regard to their earnings from tips.

The cases have a common background.   Prior to October 24, 1938, the effective date of the Fair Labor Standards Act, the redcaps at the terminals in question performed their familiar tasks without reward other than the tips of the passengers, and, although subject to considerable supervision by the terminals,[2] were not officially considered employees.   On September 29, 1938, the Interstate Commerce Commission, acting under § 1 of the Railway Labor Act, 45 U. S. C. § 151, ruled that redcaps in cities of over 100,000 population were employees within that Act.   229 I. C. C. 410.

Subsequent to that ruling, the parallel series of events culminating in the two controversies now before us, while differing in details, followed the same general pattern.   In No. 112, nothing further occurred until the Fair Labor Standards Act became effective.   At that time, the Jacksonville Terminal, in supposed compliance with the Act, began paying its redcaps in cash the amount by which the statutory minimum wage exceeded each redcap's receipts in tips.   This system, in some form, was used at the terminal until July 1, 1940.

---

[1] See Anderson, Tips and Legal Minimum Wages, XXXI American Labor Legislation Review 11; Gilson, Tips and Social Insurance, *id.* 67; Needleman, Tipping as a Factor in Wages, Monthly Labor Review, December 1937, p. 1303.

[2] For example, the terminals forbade the collection of charges for redcap services, issued instructions for the meeting of sick or disabled passengers, provided equipment for that purpose, and required that redcaps be uniformed and suitably dispersed about the terminal at such hours and in such places as their services would be needed.

In the belief that the Act required payment of the minimum wage without deduction of tips, the redcaps, by their representative, Williams, brought an action against the terminal in United States District Court for the recovery of unpaid minimum wages between October 24, 1938, and July 1, 1940, and an equal additional amount as liquidated damages. Jurisdiction of the action was conferred by § 24 (8) of the Judicial Code, 28 U. S. C. § 41 (8), and by § 16 (b) of the F. L. S. A., 29 U. S. C. § 216 (b).[3] The terminal answered and moved for summary judgment. Upon consideration of the exhibits, depositions, and stipulated facts the trial judge granted the motion, and the Circuit Court of Appeals affirmed. 118 F. 2d 324. Because of the importance of the question whether the tips could be treated as payment of the statutory wage, the petition of the redcaps' representative for certiorari was granted. 314 U. S. 590.

Section 6 of the Act requires every employer to pay each employee engaged in interstate commerce wages at

---

[3] "(b) Any employer who violates the provisions of section 6 or section 7 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." June 25, 1938, c. 676, § 16 (b), 52 Stat. 1069.

the prescribed rates per hour.[4]  Violation of that requirement renders the employer liable for the unpaid wages and for liquidated damages, recoverable in an action by the employees' designated agent or representative.[5]  Since the terminal admitted by stipulation that Williams was the redcaps' authorized representative *ad litem,* that the redcaps were its employees, and that they were engaged in interstate commerce, the sole issue was whether the payment required by § 6 of the Act had been made.

The evidence, taken most favorably to the redcaps, discloses the following.  About October 24, 1938, the effec-

---

[4] "(a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—

"(1) during the first year from the effective date of this section, not less than 25 cents an hour,

"(2) during the next six years from such date, not less than 30 cents an hour,

.        .        .        .        .

"(b) This section shall take effect upon the expiration of one hundred and twenty days from the date of enactment of this Act." June 25, 1938, c. 676, § 6, 52 Stat. 1062, 29 U. S. C. § 206.

"As used in this Act . . . (b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof.

"(e) 'Employee' includes any individual employed by an employer.

"(m) 'Wage' paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." June 25, 1938, c. 676, § 3, 52 Stat. 1060, 29 U. S. C. § 203.

[5] See note 3, *supra.*

tive date of the Act, the terminal issued a written notice to each redcap:

"Jacksonville, Florida,
"Oct. 24th, 1938.

"To Red Cap ....................,
  "Jacksonville Terminal Company:

"In view of the requirements of the Fair Labor Standards Act, effective October 24, 1938, and in consideration of your hereafter engaging in the handling of hand baggage and traveling effects of passengers or otherwise assisting them at or about stations or destinations, it will be necessary that you report daily to the undersigned the amounts received by you as tips or remuneration for such services.

"The carrier hereby guarantees to each person continuing such service after October 24, 1938 compensation which, together with and including the sums of money received as above provided, which [sic] will not be less than the minimum wage provided by law.

"You are privileged to retain subject to their being credited on such guarantee all such tips or remuneration received by you except such portion thereof as may be required of you by the undersigned for taxes of any character imposed upon you by law and collectible by the undersigned.

"All the matters above referred to are subject to the right of the carrier to determine from time to time the number and identity of persons to be permitted to engage in said work and the hours to be devoted thereto, to establish rules and regulations relating to the manner, method and place of rendition of such service, and the accounting required.

"JACKSONVILLE TERMINAL COMPANY,
  "By J. L. WILKES,
          "President-General Manager."

On November 3rd L. L. Wooten, the General Chairman of the Brotherhood of Railway and Steamship Clerks, received the redcaps' designation of the Brotherhood as their bargaining representative. November 4th he saw a copy of the terminal's notice. In the meantime he had written Wilkes on October 25th that in view of the I. C. C. decision he considered the redcaps covered by the collective labor agreement of February 1, 1937, between the Brotherhood and the terminal, and within the union's jurisdiction. After the designation the Brotherhood, continually protesting the invalidity of the existing accounting and guarantee system,[6] attempted negotiations with the terminal for a redcap contract. Eventually, June 16, 1939, a contract limited to hours of service and working conditions was signed. Meanwhile the redcaps continued their accustomed activities, made the reports, kept the tips, and accepted the sums proffered them by the terminal. At first, no receipts for wage payments were required at Jacksonville; later, receipts were introduced expressly reserving the redcaps' right to sue for additional amounts under the Act.[7] On July 1, 1940, the terminal inaugurated a new system of charging passengers ten cents per parcel for redcap service, and paying the redcaps an hourly wage. An agreement with the Brotherhood reducing this arrangement to writing and ending the controversial accounting and guarantee system was signed August 9th.

---

[6] The system was so described because the redcaps made a daily accounting of the number of hours worked, and the amount of tips collected, and because the terminal guaranteed the overall receipt of the minimum wage by paying the redcaps semi-monthly any shortage between the total tips and the minimum.

[7] The receipt stated:

"It is my understanding that by signing this receipt I do not forfeit or release my right to sue for such additional amount as may be due under Section 16 (b) of the Act."

No. 1023 is a similar proceeding brought against the Union Terminal Company by Pickett, the agent of forty-five redcaps working in the Dallas terminal. At the trial, the evidence, consisting of an agreed statement of facts, some exhibits, and some uncontradicted testimony, indicated, and the trial judge found, that the redcaps were employees of the terminal and were engaged in interstate commerce. He further found that prior to the Fair Labor Standards Act the redcaps were paid by the tips of the public, that no other contract was made on or since October 22, 1938, and that the question of tips as wages was still an open one. On the ground that tips of the public were not wages paid by the employer, he gave judgment in favor of the redcaps. The Circuit Court of Appeals reversed, 118 F. 2d 328, and certiorari was denied. 313 U. S. 591. Because of the importance of the issues presented, on petition for rehearing certiorari was granted. 314 U. S. 701.

Since the basic elements of Pickett's case are no longer in dispute, the crucial issue again is whether the minimum wages were paid. It was shown that, after the I. C. C. ruling that redcaps were employees, the redcaps notified the Dallas terminal on October 11, 1938, that the Board of Adjustment of the Brotherhood of Railway and Steamship Clerks was their authorized representative under the Railway Labor Act, and Pickett, as General Chairman of the Board, asked for a conference in order to negotiate an agreement. On October 22d, the terminal delivered to each redcap a letter, signed by Buckner, the terminal's vice-president and general manager, in the same terms as the notice used at the Jacksonville terminal.

Two days later, on October 24th, the effective date of the wage law, Pickett, on behalf of the redcaps and at

their request, protested this proposal in a letter to Buckner,[8] concluding:

"This letter is formal notice to the carrier, made for and on behalf of each employee concerned as a protest against the method proposed by the carrier to meet its

[8] The entire letter is as follows:

"I have a copy of a circular issued by your Company dated at Dallas, Texas, on October 22, 1938, and which was handed to each employee to whom it was addressed: i. e., redcaps, the general tenor of which is to require the individual employee to report to the carrier the amount that he receives in tips from the public and which information the carrier intends to employ, in compiling its records to indicate that it has complied with Section 6 of the Fair Labor Standards Act:

"In other words, the carrier contemplates crediting tips and other moneys paid to its employees by persons other than itself to relieve itself of the obligations imposed by the following quoted section of the law:

" 'Fair Labor Standards Act:

" 'Section 6-(a). Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—

" '(1) during the first year from the effective date of this section, not less than 25 cents an hour.'

"The above section of the law which is quoted in part for the purpose of this notice, clearly sets forth that every employer who engages in commerce shall pay to each his employees during the first year after the effective date of the law 25 cents per hour.

"An examination of the law in its entirety does not authorize the carrier to depend upon others to discharge its obligation with respect to the law, in payment of wages imposed thereby.

"This letter is formal notice to the carrier, made for and on behalf of each employee concerned as a protest against the method proposed by the carrier to meet its obligation under the said law, and since it appears that the carrier has acted in the premise without authority of law or upon order of the Administrator, we are accordingly filing this notice of protest, for the reasons set forth herein."

obligation under the said law, and since it appears that the carrier has acted in the premise without authority of law or upon order of the Administrator, we are accordingly filing this notice of protest, for the reasons set forth herein."

No action was ever taken to recall or revoke the letter of protest and the individual redcaps never told the company that they accepted the terms of its letter of October 24th.

On December 26th, 1938, Pickett submitted to Buckner a proposed general agreement covering the hours of service and working conditions of the redcaps, but not their wages. After protracted consideration of the matter by both the terminal and the union, Buckner wrote Pickett on December 6, 1939, as follows:

"As I told you and as you know, this case as to whether or not the railroads will be allowed credit for tips received up to $2.40 per day, is in the Court and as soon as same is decided we will be glad to negotiate an agreement with the Clerks Union, of which you are the General Chairman for this Company."

On January 1, 1940, although the wage dispute was not yet settled, a working agreement of the limited type Pickett had proposed was signed. On March 6, 1940, the accounting and guarantee system was abandoned by the terminal, presumably for the ten cents per parcel charge, and the following day this action was commenced. Throughout the entire preceding period the redcaps had performed their usual duties, had filed slips showing the hours worked and, except for a brief period, the tips received, had kept the tips, and had accepted the money paid by the terminal pursuant to its guarantee. Never, however, was the demand for additional pay abandoned, and no redcaps were discharged for refusing to expressly consent to the terminal's action.

*Effect of Terminals' Notice.* The terminal companies instituted the accounting and guarantee system by the written notice, quoted above, to each redcap as the Act became effective. It is accepted here by all parties that, both prior and subsequent to the notice, the redcaps were employees of the railroads [9] engaged in a service "so closely related to physical transportation" in interstate commerce as to come under § 6 (1) of the Interstate Commerce Act. Stopher v. Cincinnati Union Terminal Co., 246 I. C. C. 41, 45. As such employees, before the notice they were permitted by agreement to come upon the terminal property, render supervised service to the companies' customers and receive pay for performing this portion of the terminals' transportation business by retaining all tips received. This employment of the redcaps was at will and subject to the employers' conclusions as to the desirability of continuing their employment. In businesses where tipping is customary, the tips, in the absence of an explicit contrary understanding, belong to the recipient. *Polites* v. *Barlin,* 149 Ky. 376, 149 S. W. 828; *Zappas* v. *Roumeliote,* 156 Iowa 709, 137 N. W. 935; *Manubens* v. *Leon,* [1919] 1 K. B. 208. Where, however, an arrangement is made by which the employee agrees to turn over the tips to the employer, in the absence of statutory interference, no reason is perceived for its invalidity.[10] The employer furnishes the facilities, supervises the work and

[9] In the Matter of Regulations Concerning Class of Employees and Subordinate Officials to be Included within Term "Employee" Under the Railway Labor Act, Ex parte No. 72 (Sub.-No. 1), 229 I. C. C. 410; cf. *Cole* v. *Atlantic Coast Line R. Co.,* 211 N. C. 591, 191 S. E. 353; *Booker* v. *Pennsylvania R. Co.,* 82 Pa. Super. 588.

[10] On the general question of the validity of a contract to turn over tips, see the following cases: *Harrison* v. *Kansas City Terminal Ry. Co.,* 36 F. Supp. 434, 438; *Gloyd* v. *Hotel La Salle Co.,* 221 Ill. App. 104; *In re Farb,* 178 Cal. 592, 174 P. 320; *Setree* v. *Falkner,* 5 Labor Cases ¶ 60,779, 2 P. H. Labor Service ¶ 22,547 (Ohio App.).

may take the compensation paid by travelers for the service, whether paid as a fixed charge or as a tip. A tip to a redcap is compensation for service. It is customarily given and always expected when such service is rendered.

With the effective date of the Act the employers became bound to pay a minimum wage to their employees, the redcaps. Accordingly, the latter were notified that future earnings from tips must be accounted for and considered as wages. Although continuously protesting the authority of the railroads to take over the tips, the redcaps remained at work subject to the requirement. Such protests were unavailing against the employers. Although the new plan was not satisfactory to the redcaps, the notice transferred to the railroads' credit so much of the tips as it affected. By continuing to work, a new contract was created. This result follows because the employer, after notice, may keep all earnings arising from the business. Labatt, Master & Servant, (2d ed.) Vol. 5, § 2037; Restatement, Agency, § 388. If the redcap did not accept the terms offered, he would be a volunteer and not an employee. As a volunteer he could probably keep his tips, but would not be entitled to a contractual wage. Restatement, Contracts, § 55. No such gift of services to the terminals is here claimed.

*Railway Labor Act.* Petitioners assert that, whatever may be the authority to issue orders for the accounting and guarantee plan, these railroads could not validly exercise the power because of the Railway Labor Act. 48 Stat. 1185. The applicable provisions are quoted in the note below.[11]

_____

[11] 48 Stat. 1187–88, § 2. "First. It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any

The object of the Act is to avoid interruption to commerce through the promotion of free association among employees for the purpose of settling disputes between them and the carriers. § 2. To assure continued operations, changes by the carriers in agreements reached through collective bargaining, pending negotiations, are prohibited. Independent individual contracts are not affected by the Act. It is to be noted that § 2, First to Sixth, inclusive, relied upon by petitioners, is largely concerned with the organization of employees, freedom from carrier interference in such organization, the choice of representatives for collective bargaining, and the manner

interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

"Second. All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute."

"Seventh. No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 6 of this Act." 45 U. S. C. § 152.

*Id.*, 1197. "Sec. 6. Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 5 of this Act, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board." 45 U. S. C. § 156.

of entering into and carrying on such negotiations. Section 2, Seventh, note 11, *supra,* forbids changes of pay or working conditions of employees "as a class as embodied in agreements" except as provided in § 6, note 11, *supra.* The crucial § 6 is phrased so as to leave no doubt that only agreements reached after collective bargaining were covered. Section 2, Seventh, first appeared in the 1934 amendments to the Railway Labor Act, and § 6 was likewise then amended by adding "in agreements" to that section's former requirement of notice of "an intended change affecting rates of pay, rules or working conditions." Compare § 6, 44 Stat. 582, with § 6, 48 Stat. 1197. These additions point squarely to limiting the bargaining provisions of the Railway Labor Act to collective action.[12]

In No. 112, the Jacksonville case, petitioners find such an agreement in the contract of February 1, 1937, the "Revised Agreement Between the Jacksonville Terminal Company and Employees Herein Named Represented by the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees." The scope of that agreement is limited to the hours of service and working conditions of certain groups of employees, in none of which do redcaps appear.[13] Wages are not covered. When the contract was negotiated, the redcaps were not thought of as employees engaged in

---

[12] Cf. *Virginian Ry. Co.* v. *Federation,* 300 U. S. 515, 548–549; *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1, 44–45.

[13] The closest are groups (2) and (3) described as follows:

"Group (2) Other office and station employees—such as office boys, messengers, chore boys, train announcers, gatemen, baggage and parcel room employees, train and engine crew callers, telephone switchboard operators, elevator operators, office, station and warehouse watchmen and janitors.

"Group (3) Laborers employed in and around stations, storehouse, and warehouses."

transportation service.[14] Evidently the redcaps only authorized the contracting Brotherhood to represent them after the notice.[15] Neither party to the agreement took any steps in regard to the redcaps under the 1937 agreement until after the disputed plan was instituted. Thereafter, when the Brotherhood first claimed that the redcaps were covered by the 1937 Clerks' contract, the suggestion was promptly repudiated in writing by the terminal company. Finally, after the authorization, the Brotherhood did immediately begin negotiations for the redcaps and ultimately secured a collective contract, June 16, 1939, which covered hours of service and working conditions and which embodied much that was in the Clerks' contract. Subsequently a wage agreement of August 9, 1940, became a part of this earlier working agreement. While no finding as to its coverage appears in the record, we are clear from the 1937 contract, its practical application by the parties and the new arrangements ultimately concluded, that the redcaps were not within its terms.

A different approach to this particular problem is made by petitioner in No. 1023, the *Union Terminal* case. The

[14] Ex parte No. 72 (Sub.-No. 1), *supra,* n. 9; Stopher *v.* Cincinnati Union Terminal Co., 246 I. C. C. 41.

[15] The General Chairman of the Brotherhood testified:

"Q. Does that organization have the authority, or were they appointed by the redcaps, or the plaintiffs in this case, the redcaps employed by the Jacksonville Terminal Company, to negotiate contracts and wage agreements for them with a Jacksonville Terminal Company?

"A. It was.

"Q. At or about what time?

"A. About November 3rd, was when the official authorizations were turned over to me.

"Q. What year?

"A. 1938."

Dallas redcaps do not rest their argument upon any collective agreement. Their contention is that, since the Brotherhood of Clerks, their then accredited representative for the purposes of the Railway Labor Act, had asked the terminal on October 11, 1938, for a conference to negotiate an agreement for working conditions and other related subjects, the subsequent act of the terminal in establishing the accounting and guarantee plan violated the Railway Labor Act and was therefore ineffective to change the existing arrangements by which the redcaps retained the tips as their own. This, it is urged, would result in a recovery of the minimum wage without credit to the carrier for the tips. Petitioner relies upon the first six paragraphs of § 2 of the Railway Labor Act, 48 Stat. 1187, and particularly § 2, First, note 11, *supra*, placing the duty on the carrier to "make . . . agreements . . . in order to avoid any interruption . . . to the operation of any carrier."

The Brotherhood and the terminal did negotiate and finally concluded, effective January 1, 1940, their first collective working agreement covering the redcaps. Because the carrier was, by the Act, placed under the duty to exert every effort to make collective agreements, it does not follow that, pending those negotiations, where no collective bargaining agreements are or have been in effect, the carrier cannot exercise its authority to arrange its business relations with its employees in the manner shown in this record. As we have stated in discussing the *Jacksonville* case, the Railway Labor Act dealt with collective bargaining agreements only, and not with the employment of individuals. This conclusion is pertinent in considering the effect of the Dallas request for collective bargaining.

The institution of negotiations for collective bargaining does not change the authority of the carrier. The prohibi-

tions of § 6 against change of wages or conditions pending bargaining and those of § 2, Seventh, are aimed at preventing changes in conditions previously fixed by collective bargaining agreements. Arrangements made after collective bargaining obviously are entitled to a higher degree of permanency and continuity than those made by the carrier for its own convenience and purpose.

*Minimum Wages.* We stated in the discussion of the notice given by the terminals to their employees that its effect was to transfer the tips covered by the notice to the credit of the terminals. But this terminal credit in the hands of the redcaps, assert petitioners in both cases, cannot be utilized as cash paid to the employee by the employer.[16] It is urged that the terminals have worked out a scheme to largely relieve themselves of wage payments to redcaps and to let travelers pay "amounts which the law requires should be paid by the employer itself," and that the accounting difficulties make the plan not only undesirable but contrary to the policy of the statute as likely to foster false reports of tips by redcaps in order to reach the minimum and save the terminals from any guarantee payments.

Section 6 prescribed that "Every employer shall pay to each of his employees . . . wages at the following rates. . . ." Wages are defined only by the direction to include

---

[16] In No. 112, petitioners say: "We are dealing here only with Fair Labor Standards Act and not any other Act, statute or ruling of any commission. It is the mandatory requirement of the act 'that the employer shall pay.' The act contains no word, or words, or phrases suggesting any guarantee of payment."

In No. 1023, petitioners say: "We, of course, do not want to be understood as contending that 25 cents received in tips will not purchase as much as 25 cents received in wages, but we do say that Congress had the right to say what means should be employed to carry out the purposes of the act, and that Congress has said, and for very good reasons, that the purposes of the act can best be accomplished by a direct wage payment from the employer to the employee."

in that word the "reasonable cost . . . to the employer of furnishing such employee with board, lodging, or other facilities. . . ." What the word "wages" connotes in addition to the items specified, we must deduce from other provisions of the act in the light of its legislative purpose. Obviously, "pay wages" ordinarily means for the employer to hand over money or orders convertible into money at face. The absence of the word "tip" from the statutory extension of the ordinary meaning of wages makes it quite clear that not every gratuity given a worker by his employer's customer is a part of his wages. If Congress had had it in mind to include in wages all tips, the words were readily available for expressing the thought. Such a conclusion, however, does not foreclose a decision that in certain specific situations the so-called tips may be in reality the employee's compensation for his services, and therefore wages.

The diverse interests of employers and employees have variously influenced legislators to include, exclude, or ignore tips in the specification of wage items in enactments where the wage base was important. For example, the Longshoremen's and Harbor Workers' Compensation Act,[17] which also applies to employment in the District of Columbia,[18] specifically includes tips for computation of compensation. Workmen's compensation acts are usually construed as including tips in wages or remuneration, with a tendency to make the inclusion of tips as wages turn upon the contemplation of the parties, express or implied, in wage contracts.[19] State minimum wage acts are gen-

---

[17] March 4, 1927, c. 509, § 2 (13), 44 Stat. 1425; 33 U. S. C. § 902 (13).

[18] Act of May 17, 1928, c. 612, 45 Stat. 600.

[19] Compare *Hartford Co.* v. *Industrial Accident Comm'n,* 41 Cal. App. 543, 183 P. 234; *Gladys Gross' Case,* 132 Me. 59, 166 A. 55; *Powers's Case,* 275 Mass. 515, 176 N. E. 621; *Sloat* v. *Rochester Taxicab Co.,*

erally silent as to tips.[20]    Under the N. R. A. the inclusion
of tips in wages on, a plan similar to the accounting and

177 App. Div. 57, 163 N. Y. S. 904, aff'd mem. 221 N. Y. 491, 116 N. E.
1076; *Bryant* v. *Pullman Co.*, 188 App. Div. 311, 177 N. Y. S. 488,
aff'd mem. 228 N. Y. 579, 127 N. E. 909; *Kadison* v. *Gottlieb*, 226 App.
Div. 700, 233 N. Y. S. 485; *Lloyds Casualty Co.* v. *Meredith*, 63 S. W.
2d 1051 (Tex. Civ. App.); *Federal Underwriters Exchange* v. *Husted*,
94 S. W. 2d 540 (Tex. Civ. App.); *Penn* v. *Spiers & Pond, Ltd.*, [1908]
1 K. B. 766 (C. A.); *Great Western Ry. Co.* v. *Helps*, [1918] A. C. 141
(H. L.) with *Begendorf* v. *Swift & Co.*, 193 App. Div. 404, 183 N. Y. S.
917; *Anderson* v. *Horling*, 214 App. Div. 826, 211 N. Y. S. 487. But
cf. *Industrial Comm'n* v. *Lindvay*, 94 Colo. 531, 31 P. 2d 495; *Makris*
v. *Top Hat Restaurant, Inc.*, 16 N. J. Misc. 26, 195 A. 857; *Coates* v.
*Warren Hotel*, 18 N. J. Misc. 363, 13 A. 2d 787, where gratuities were
excluded by statute.   Unemployment compensation is apparently fol-
lowing the same trend.   Compare *Matter of Feinberg*, 258 App. Div.
834, 15 N. Y. S. 2d 766 with *Alexander Hamilton Hotel Corp.* v. *Board
of Review*, 127 N. J. L. 184, 21 A. 2d 739.   See Wage and Hour Manual
(1941 ed.) 191.

[20] See 2A C. C. H. Labor Law Serv. (3d ed.), 2 P. H. Labor Serv.,
*passim.*   Probably this is due to the fact that in most states the statute
does not fix the minimum, but merely authorizes some board or official
to do so by orders, occupation by occupation.   Such orders as relate
to trades in which tipping is common seem to take tips into considera-
tion in setting the minimum wage for that trade, and quite naturally,
therefore, are apt expressly to forbid crediting of tips against the
minimum.

E. g., New York State Dept. of Labor, Minimum Wage Standards,
Directory Order No. 5, Restaurant Industry, effective June 3, 1940,
provides: "SERVICE EMPLOYEES Basic Rate.   The basic minimum wage
for *service employees* in New York City shall be at the rate of 20
cents per hour. . . .   NON-SERVICE EMPLOYEES Basic Rate.   The
basic minimum wage for *non-service employees* in New York City
shall be at the rate of 29 cents per hour . . . from June 3, 1940
through March 2, 1941 and 30 cents thereafter. . . .   GRATUITIES.   In
no event shall gratuities from patrons or others be counted as part of
the minimum wage.   SERVICE EMPLOYEE.   'Service employee' means
any employee whose duties relate solely to the serving of food to patrons
seated at tables and to the performance of duties incidental thereto,
and who customarily receive gratuities from such patrons."   See also,

guarantee plan here involved, was proposed.[21]   In the approved codes, tips were not expressly credited toward wages, but the relatively lower minimums for those customarily receiving tips may indicate that tips were given weight although not expressly mentioned.[22]   The federal social security laws define wages for old age benefits [23] and social security taxes [24] as "all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash."   The regulations of the Social Security Board state, "The following are excluded from the computation of 'wages': . . .   Tips or gratuities paid directly to an employee by a customer of an employer, and not in any way accounted for by the employee to the employer." [25]   The Railroad Retirement Act, § 1 (h),[26]

---

New York State Dept. of Labor, Minimum Wage Standards, Directory Order No. 6, Hotel Industry, effective Nov. 25, 1940; New Hampshire Bureau of Labor, Minimum Wage Division, Mandatory Order No. 3, Restaurant Occupation, effective Nov. 1, 1938; District of Columbia Minimum Wage Board, Order No. 4, Public Housekeeping Occupation, effective May 8, 1938, and reprinted in the Annual Report of the Board for 1939, pp. 27 ff.

[21] Proposed Code of Fair Competition for the Hotel Industry, submitted Sept. 6, 1933, by the American Hotel Association, Art. III (C) (e); Proposed Code of Fair Competition for the Barber Shop Trade, as revised for public hearing on Jan. 8, 1934, submitted by the Barbers' Industrial Recovery Association, Art. IV (1); Restaurant Industry Code of Fair Competition, submitted Sept. 12, 1933, by the National Restaurant Association, Art. IV, § 6.

[22] See Needleman, Tipping as a Factor in Wages, *supra*, note 1, at 1319.

[23] Aug. 10, 1939, c. 666, § 209 (a), 53 Stat. 1373; 42 U. S. C. § 409 (a).

[24] I. R. C. §§ 1426 (a), 1607 (b), 53 Stat. 1383, 1392; 26 U. S. C. §§ 1426 (a), 1607 (b).

[25] Reg. 2, Art. 14, Social Security Board, 2 F. R. 1280; 20 C. F. R. § 402.14.   See also S. S. T. 301, 1938–1 Cum. Bull. 455.

[26] Act of June 24, 1937, c. 382, § 1 (h), 50 Stat. 309; 45 U. S. C. § 228a (h).

and the Railroad Unemployment Insurance Act, § 1 (i)[27] exclude tips from "compensation" within the meaning of their provisions. The Railroad Retirement Board has determined that all earnings of the redcaps, accounted for to the carriers under the plan here in question, are "money remuneration" and therefore "compensation" under the acts and not forbidden "tips."[28] We can therefore examine the Fair Labor Standards Act with the safe assumption that the word "wages" has no fixed meaning either including or excluding gratuities.

To interpret "pay wages" as limited to money passing from the terminal to the redcap would let construction of an important statute turn on a narrow technicality. It, of course, can make no practical difference whether the redcaps first turn in their tips and then receive their minimum wage or are charged with the tips received up to the minimum wage per hour.[29]

---

[27] Act of June 25, 1938, c. 680, § 1 (i), 52 Stat. 1095; 45 U. S. C. § 351 (i).

[28] Opinion No. 1941, R. R. 35, U. I. 11, approved by the Board on September 18, 1941, B. O. 41–397, 3 Railroad Retirement Law Bulletin —.

[29] The former plan is substantially the tag system put into effect by agreement of the red caps and the carrier at Jacksonville following the termination of the accounting and guarantee system. The important provisions are:

"1. Red Caps will be paid the hourly wage established by the Hours and the Wage Law, or orders of the Administrator, at the minimum set in such orders or law.

.          .          .          .

"3. Daily records of each Red Cap's hours, tags sold, and money re-remitted, will be kept by the Company; at the end of each 15 day period or pay roll period, all money received from sale of checks, etc., by Red Caps will be totaled, wages paid to Red Caps, deducted, after one (1) cent per parcel or tag has been set aside for Company expenses, the remaining nine (9) cents used to pay wages of Red

408

Congress approached the problem of improving labor conditions by the establishment of a minimum wage in certain industries. It required that workers in these industries receive a compensation at least as great as that fixed by the Act. Except for that requirement, the employer was left free, in so far as the Act was concerned, to work out the compensation problem in his own way. Other courts are in accord with our view. *Harrison* v. *Kansas City Terminal Ry. Co.*, 36 F. Supp. 434; *Harrison* v. *Terminal Railroad Assn. of St. Louis*, 4 C. C. H. Labor Cases ¶ 60,346; *Ryan* v. *Denver Union Terminal Co.*, *id.*, ¶ 60,618.

The other arguments of petitioner have been considered, but we find only two that require mention.

*First.* It is said that if the carriers take credit for the tips as compensation for redcap service, it would be in effect a charge by the terminals for a transportation service, and therefore, since the terminals have filed no covering tariff, a violation of § 6 (7) of the Interstate Commerce Act, 34 Stat. 587, 49 U. S. C. § 6 (7).[30] Furthermore, petitioners assert § 2 of the same act, prohibiting special rates, is violated because by the carrier's regulations the indigent receive the redcap service without charge. Neither contention, if true, would avail petitioners. Sections 8, 9 and 10 of the Interstate Commerce

Caps, and Captains, other than the ten (10) cents per hour for Captains covered in Item 2.

"If the sum total of nine (9) cents per parcel handled and or tags sold is greater than the wages paid to Red Caps for that period, the remaining funds will be divided among all Red Caps on the basis of hours worked during the pay roll period, so that all Red Caps will share alike for each hours service, from this fund. If the nine (9) cents per parcel handled is not sufficient to pay wages outlined in item (1) of this agreement, the Terminal Co. agrees to pay the wages as outlined in item 1."

[30] Cf. Stopher *v.* Cincinnati Union Terminal Co., 246 I. C. C. 41.

Act provide for damages to persons injured by unlawful acts and punishment of the carrier or its agents. There is nothing in the sections to indicate that petitioners would have a right of action.[31]

*Second.* It is urged in the *Dallas* case that the terminal from March 1, 1939, to October 15, 1939, voluntarily abandoned the accounting and guarantee system in favor of the old system of non-accountability for tips. We find nothing in the modified accounting practice during that period to support such a conclusion. Rather the terminal seems only to have simplified its bookkeeping and partially relieved the redcaps of clerical duties. Prior to March 1, 1939, and after October 15th, the redcaps had to make a daily report of both hours worked and tips received regardless of amount, on a printed time slip furnished by the terminal for the purpose. Between March 1st and October 15th, the time slips furnished by the company contained no provision for reporting tips, but only for reporting hours.[32] But the redcaps were instructed

---

[31] Brownlee *v.* Southern Ry. Co., 192 I. C. C. 119, 121. The Commission stated: "It is well settled that a carrier is entitled to compensation for any transportation service rendered, and that where a service has been rendered for which no tariff authority exists and the beneficiary of such service has paid the sum claimed by the carrier, we are empowered to order the payment of reparation only in the event the sum paid by the shipper amounted to an unjust or unreasonable exaction for the service received." See also Twin Coach Corp. *v.* Erie R. Co., 203 I. C. C. 393, 395; Cities Service Oil Co. *v.* Erie R. Co., 237 I. C. C. 387, 389.

[32] Mr. Flanagan:

"We next offer in evidence PLAINTIFF's EXHIBIT 'C', which is also a time slip but a little different from the one just read, and it reads:

" 'The Union Terminal Company. Date ................ Hours on duty from ...... M. to ...... M., showing four of those lines.'

"And then says: 'Total hours worked' .........., and then a blank line to be signed by the Red Cap and right under it the words, 'Red Cap.'

"I call attention to the fact that on this slip there is no provision for reporting the tips."

that should any of them, during any work period, receive in tips less than 25 cents per hour, the statutory minimum hourly wage, he should report it to the terminal and the terminal would pay the difference between the tips received and the minimum wage. Thus the only effect of the change was to eliminate the superfluous reporting of tips equalling or exceeding the minimum wage—a step toward more efficient administration, not elimination, of the accounting and guarantee system.

*Affirmed.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY concur.

I think the judgments should be reversed. It appears to me that the question in these cases is: Upon whom does the statute impose the duty of paying a minimum wage, the employer or someone else? There is no ambiguity in the congressional mandate that "Every employer shall pay to each of his employees . . . wages . . . not less than 30 cents an hour." I am unable to agree that tips given to redcaps by travellers are "wages" paid to the redcaps by the railroad.

The employers here could have openly charged a fee for the services performed by redcaps. It appears that they have now adopted such a system. It is said that there is no practical difference between a system under which the railroads openly impose a charge on the public and one under which the redcaps accept from travellers so-called tips, treated by the railroad as a part of the redcaps' wages. Generally, the traveller who pays a railroad charge knows he is paying it to the railroad. One who gives a redcap a tip does not necessarily know that he is thereby helping the railroad to discharge its statutory duty

of paying a minimum wage to its employees. The tip-paying public is entitled to know whom it tips, the redcap or the railroad. A plan like that before us, which covertly diverts tips from employees for whom the giver intended them to employers for whom the giver did not intend them and to whom any kind of tip doubtless would not have been voluntarily given, seems to me to contain an element of deception. And I think an interpretation of the F. L. S. A. which permits employers to benefit from such a plan does not accord with the meaning of the language used by Congress.