### WEIR et al. v. HUDSON COAL CO.
Civ. No. 2893.

United States District Court
M. D. Pennsylvania.
Aug. 17, 1951.

---

6. 1948 Edition, section 4161.

7. 1948 Edition, section 4205.

424

James G. McDonough, Robert Martin and Bernard J. Brown, Scranton, Pa., for plaintiffs.

R. S. Houck, Francis D. Mahon, Scranton, Pa., for defendant.

WATSON, Chief Judge.

This is an action under the Fair Labor Standards Act of 1938,[1] to recover amounts alleged to be due as wages, together with liquidated damages and attorneys' fees. A stipulation of facts has been filed by the parties which are adopted as the Court's findings of fact.

Plaintiffs were employed by the defendant in the production of goods for commerce as defined by Section 3(j) of the Fair Labor Standards Act, being employed as patrolmen. Defendant is a Pennsylvania corporation engaged in the business of mining, preparing and selling anthracite coal.

Plaintiffs contend that defendant should have paid them a higher hourly rate for regular hours and a higher hourly rate for

---

1. Act of Congress of June 25, 1938, c. 676, 29 U.S.C.A. § 201 et seq.

overtime hours during the workweek periods hereinafter more specifically set forth as to each plaintiff's claim.

Except in the case of Edward A. Cummings and William P. Bradley, plaintiffs were individually employed by the defendant at divers times prior to March 1942 under oral contracts and for an indefinite period. As patrolmen, the plaintiffs worked 5 days per week and 12 hours per day or a total of 60 hours per week, and prior to March 1942 received a monthly salary of $132.76. In March, 1942, the defendant submitted to each patrolman a written contract of hire providing for certain changes in his employment, which written contract contained the following provision: "(2) The employee is employed upon an hourly basis, and his rate of pay shall be $0.4378 per hour for the first forty hours worked in each week, and for any hours worked in any week in excess of that number, he shall be paid one and one-half times that rate."

Six of the named plaintiffs signed the written contracts of hire, but six others refused to sign. Two of the plaintiffs, Bradley and Cummings, were not employed until after March, 1942, but signed similar contracts after they were employed.

On July 10, 1942, defendant sent letters to each of the six plaintiffs who refused to sign the above contracts of hire, informing them that from and after July 16, 1942 the terms of employment would be the same as contained in the written contracts of hire submitted to them in March, 1942.

On or about July 11, 1942, the six plaintiffs who refused to sign the written contracts of hire, and two other plaintiffs who had signed the contracts of hire, sent a joint letter to the defendant, acknowledging receipt of defendant's letter of July 10, 1942, and advising defendant that they refused to accept $0.4378 per hour as their basic hourly rate of pay, and further stated:

"We and each of us shall continue performing our present duties as we have so performed them in the past and we and each of us hereby state that our continuing to work shall not be considered as a voluntary acceptance of the proposed reduction of wages."

"We and each of us feels that the Fair Labor Standards Act of 1938 prohibits such an involuntary reduction in that it is an attempt to evade the provisions of said Act."

By letter dated July 14, 1942, defendant acknowledged receipt of the above joint letter of July 11, 1942 to each of the eight plaintiffs, denying that the hourly rate of $0.4378 was an evasion of the Fair Labor Standards Act of 1938 and further stated: "We therefore must insist that if you continue to work for us after July 16, 1942, you must accept in full compensation for your services the rates and conditions of employment stated in our letter of July 10, 1942."

Plaintiffs thereafter were granted increases in pay from time to time resulting in a higher basic hourly rate, but in each case such increases or new basic hourly rates were expressly stated to be based upon the $0.4378 per hour rate fixed by the written contracts of hire, or the letters of July 10, 1942, which were sent to those patrolmen who refused to sign the contracts of hire.

It is agreed by all parties that if the correct and legal hourly rate of pay was $0.4378 per hour on April 1, 1942 as to the plaintiffs who signed the written contracts, and on July 16, 1942 as to those who refused to sign, and if said rate, as increased in the future, continued to be the correct and legal hourly rate of pay to May 31, 1946, then the plaintiffs have received all regular and overtime wages to which they are entitled over the period covered by this suit and have no cause of action against the defendant.

At the outset it is to be noted that the Fair Labor Standards Act of 1938 did not purport to change the manner or method of making or amending contracts of hire. It established minimum wages, maximum hours and overtime rates, which must be complied with, but beyond this the employer and employee may still make or amend their own contract of employment.

Atlantic Co. v. Walling, 5 Cir., 1942, 131 F.2d 518.

It is admitted by the plaintiffs that at no time during the period in question was the hourly wage rate which they received below the minimum hourly rate established under the Fair Labor Standards Act.

■ It is well established that a general or indefinite hiring is presumed to be a hiring at will and, being at will, is subject to termination or modification at any time by either party. Trainer v. Laird, 1936, 320 Pa. 414, 183 A. 40; Thullen v. Triumph Electric Co., 3 Cir., 1915, 227 F. 837. Plaintiffs contend that as to each of the plaintiffs who refused to sign the written contract submitted to him by the defendant, there never was a new contract entered into betwen said plaintiff and defendant for there was no meeting of the minds. Plaintiffs notified defendant that they refused to accept the reduction in pay, and therefore contend that the status of the parties and the wage rate remained the same throughout the period of their employment. The United States Supreme Court, in the case of Williams v. Jacksonville Terminal Co., 1942, 315 U.S. 386, 62 S.Ct. 659, 665, 86 L.Ed. 914, held to the contrary. The question in that case was whether or not the tips received by redcaps could be considered in determining whether the redcaps were paid the minimum wage. The Terminal Co. had notified the redcaps that effective October 24, 1938 the redcaps would have to report the amount of tips received by them daily and, though allowed to retain the tips, such sums would be considered as wages. Two days later, a representative of the redcaps protested this proposal in a letter to the Terminal Company, concluding: "This letter is formal notice to the carrier, made for and on behalf of each employee concerned as a protest against the method proposed by the carrier to meet its obligation under the said law, and since it appears that the carrier has acted in the premise without authority of law or upon order of the Administrator, we are accordingly filing this notice of protest, for the reasons set forth herein."

No action was ever taken to recall or revoke the letter of protest and the individual redcaps never told the company that they accepted the terms of its letter of October 24 but throughout the entire period the redcaps performed their usual duties. The demand for additional pay was never abandoned, and no redcaps were discharged for refusing to expressly consent to the company's action. The conduct of the plaintiffs in the instant case closely parallels that followed by the redcaps, for the plaintiffs who refused to sign the contract of hire never told the defendant that they accepted the terms of defendant's letter of July 10, 1942, nor did they abandon their demand for additional pay, nor were any of them discharged for refusing to expressly consent to the defendant's action.

The Supreme Court stated, "This employment of the redcaps was at will and subject to the employers' conclusions as to the desirability of continuing their employment. * * *"

"With the effective date of the Act the employers became bound to pay a minimum wage to their employees, the redcaps. Accordingly the latter were notified that future earnings from tips must be accounted for and considered as wages. Although continuously protesting the authority of the railroads to take over the tips, the redcaps remained at work subject to the requirement. Such protests were unavailing against the employers. Although the new plan was not satisfactory to the redcaps, the notice transferred to the railroads' credit so much of the tips as it affected. *By continuing to work, a new contract was created.* (Emphasis supplied.)

In Shepler v. Crucible Fuel Co., 3 Cir., 1944, 140 F.2d 371, 374, the Court cited the "redcap case", stating, " * * * the Court held, we think broadly and unequivocally, that continuance in an employment under a new method of computing pay creates a new contract and that the employee's consent to the new arrangement may be found from the continuance, notwithstanding repeated protests on his part."

■ It is clear that all of the plaintiffs, including the nonsigners, who impliedly acquiesced in the new terms by continuing to work, entered into a contract of employment with the defendant, whereby, under a

new method of computing pay, they received $0.4378 an hour instead of the flat monthly salary of $132.76 which they had been receiving prior thereto.

Plaintiffs also contend that even if there were such contracts of employment between all of the plaintiffs and the defendant the contracts are invalid and illegal in view of the customs and usages in the Anthracite industry. Plaintiffs point out that "for many years it was the custom and usage of the Anthracite industry, at or about the same time that any increase was granted to those employees covered by the Union-Operators agreement, to grant a similar increase to all of the industry employees not covered by said agreements." Admittedly, the stipulations disclose that between 1922 and 1942 the non-union employees received two increases and two decreases, which were general to all of them, but it cannot be said that this rendered void and illegal any attempt to decrease the wages of a particular non-union group merely because the wages of the other non-union groups were not similarly decreased. Even if the custom or usage had been more firmly established, it, nevertheless, would be subject to change by the terms of a contract. Harris v. Sharples, 1902, 202 Pa. 243, 249, 51 A. 965, 58 L.R.A. 214.

Plaintiffs also contend that the contracts of hire were illegal and void, because, in reducing the hourly rate of pay, defendant violated Section 18 of the Fair Labor Standards Act of 1938, which provides in part, "* * * No provision of sections 201–219 of this title shall justify any employer in reducing a wage paid by him which is in excess of the applicable minimum wage under sections 201–219 of this title, or justify any employer in increasing hours of employment maintained by him which are shorter than the maximum hours applicable under such sections".

This section of the Act was intended merely as a warning to employers that this chapter was not designed to reduce wages which are in excess of the minimum established by the Act, or to increase hours of employment which are below the maximum hours allowed by the Act. This section, however, does not prohibit an agreement between the employer and employee to reduce wages, provided the employee receives a wage at least as high as that fixed by the Act. White v. Witwer Grocer Co., 8 Cir., 1942, 132 F.2d 108; Dolan v. Day & Zimmerman, D.C.Mass., 1946, 65 F.Supp. 923. The wages paid by the defendant, before and after the reduction in pay, were in excess of the minimum provided by Section 6 of the Act.

Plaintiffs' concluding contention was that the Emergency Price Control Act of 1942,[2] the Stabilization Act of 1942,[3] and Presidential Executive Order No. 9250 of October 3, 1942, issued pursuant thereto,[4] prohibited the payment thereafter of a wage less than the highest paid between January 1, 1942 and September 15, 1942.

The Stabilization Act of 1942 in part provides as follows: Section 1. "In order to aid in the effective prosecution of the war, the President is authorized and directed, on or before November 1, 1942, to issue a general order stabilizing prices, wages, and salaries, affecting the cost of living; and, except as otherwise provided in this Act, such stabilization shall so far as practicable be on the basis of the levels which existed on September 15, 1942. * * *" Section 4. "No action shall be taken under authority of this Act with respect to wages or salaries * * * for the purpose of reducing the wages or salaries for any particular work below the highest wages or salaries paid therefor between January 1, 1942, and September 15, 1942".

Section 1 of the Act above clearly gives the President authority to issue a general order stabilizing prices, wages and salaries on the basis of the levels which existed on September 15, 1942. To give any effect to Section 1, Section 4 must be construed to mean that the *prevailing wage rate of September 15, 1942* shall not be increased or decreased below the highest wages or sal-

---

2. 50 U.S.C.A.Appendix, § 901 et seq.

3. 50 U.S.C.A.Appendix, § 961 et seq.

4. 50 U.S.C.A.Appendix, § 901 note.

aries paid between January 1, 1942 and September 15, 1942.

Under the Presidential Executive Order 9250 the administration of the wage provision of the Stabilization Act was passed on to the National War Labor Board, and in Section 1 of Title II provided that no increases or decreases shall be authorized except upon notice and approval by the National War Labor Board. Section 2 provides that the National War Labor Board shall not approve any increase in wage rates prevailing on September 15, 1942, except in certain situations. Section 3 provides, "The National War Labor Board shall not approve a decrease in the wages for any particular work below the highest wages paid therefor between January 1, 1942 and September 15, 1942, unless to correct gross inequities and to aid in the effective prosecution of the war."

The increase and decrease in wages that the Presidential Order speaks of were those prevailing wages on September 15, 1942 and not the wages which existed two or six months prior thereto as plaintiffs contend. Plaintiffs' wages had been reduced by contracts in April and July of 1942, and hence the rate of $0.4378 an hour was the existing or prevailing rate on September 15, 1942, and it was only any increase or decrease in that rate which required approval by the National War Labor Board, and which apparently was the procedure followed in granting plaintiffs subsequent increases in pay.

Plaintiffs proceeded along the same line of argument when they submitted their complaint to the United States Conciliation Service. At the request of the plaintiffs, the matter was submitted to the Regional Attorney of the Philadelphia War Labor Board office for his opinion and he stated in his opinion inter alia: " * * * The union's contention is that the reduction in any pay rate is unauthorized because the reduced rate now in effect is less than the highest rate paid for the same work between January 1, 1942 and September 15, 1942; and that it was the intent of the Act of October 2, 1942 to preserve after the stabilization date the said highest rate unless the War Labor Board should approve a lower one."

"In my opinion this is a complete misapprehension of the intent and meaning of the above mentioned statute. The War Labor Board is directed to stabilize wages as nearly as practicable at the level of September 15, 1942. Wage increases or wage decreases since that time are subject to Board approval. The Act, however, does not grant any retroactive authority to the Board and we have always taken the position first, that if the rate was actually being paid on the stabilization date, Board approval is required for substantial changes therein, and second, that the rates existing on September 15, 1942 are presumed to be correct."

"It is, therefore, my opinion that there is no violation of the stabilization program involved in this matter, since the reduction in pay was made long before the stabilization date and the reduced rate prevailed as of September 15, 1942 as well as of the date of the stabilization act itself."

If Congress had intended to fix wages and salaries at the highest levels paid between January 1, 1942 and September 15, 1942, it could have stated such in clear language; instead, in Section 1 of the Stabilization Act, it chose to state " * * * such stabilization shall so far as practicable be on the basis of the levels which existed on September 15, 1942."

It is manifest that the hourly rate of $0.4378 was the correct and legal hourly rate of pay on April 1, 1942 for those plaintiffs who signed the written contracts of hire, and on July 16, 1942 for the plaintiffs who refused to sign the contracts of hire, and it continued to be the correct and legal hourly rate on which increases were based for the period in question. Being the correct and legal hourly rate of pay, each of the plaintiffs received all the regular and overtime wages to which he was entitled over the period covered by this suit.

The Court makes the following conclusions of law:

## Conclusions of Law.

1. This Court has jurisdiction of the subject matter of this action and of the parties hereto by virtue of Section 16(b)

of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b).

2. Plaintiffs were employed by defendant in the production of goods for commerce as defined by Section 3(j) of the Fair Labor Standards Act of 1938.

3. A general or indefinite hiring is presumed to be a hiring at will and, being at will, is subject to termination or modification at any time by either party.

4. Plaintiffs who signed the contract of hire were bound by the terms of the contract.

5. The contract of hire referred to in Paragraph 4 provided, inter alia, that plaintiffs were to receive $0.4378 an hour instead of the flat monthly salary of $132.76 which they had been receiving prior thereto, and became effective on April 1, 1942.

6. Plaintiffs who refused to sign the contract of hire were nevertheless bound by the terms of the contract as they consented to the new terms by continuing to work.

7. The terms of the contract referred to in Paragraph 5 were the same as those given to the signers of the contract of hire, but did not become effective until July 16, 1942.

8. The contracts of hire were not rendered invalid and illegal by any custom or usage in the Anthracite industry.

9. The contracts of hire did not violate Section 18 of the Fair Labor Standards Act of 1938.

10. Section 18 of the Fair Labor Standards Act of 1938 does not prohibit a reduction in wage provided the wage rate remains in excess of the minimum wage.

11. The Emergency Price Control Act of 1942, the Stabilization Act of 1942, and the Presidential Executive Order No. 9250 of October 3, 1942, individually or collectively, did not prohibit a payment of a wage less than the highest paid between January 1, 1942 and September 15, 1942, if such were the prevailing wage rate on September 15, 1942.

12. The prevailing wage rate on September 15, 1942 for all of the plaintiffs was $0.4378 an hour.

13. It was only any increase or decrease in the prevailing wage rate of September 15, 1942 which required approval by the National War Labor Board.

14. The hourly rate of $0.4378 was the correct and legal hourly rate of pay on April 1, 1942 for those plaintiffs who signed the written contracts of hire, and it continued to be the correct and legal hourly rate on which increases were based for the entire period covered by this suit.

15. The hourly rate of $0.4378 was the correct and legal hourly rate of pay on July 16, 1942 for those plaintiffs who refused to sign the written contracts of hire, and it continued to be the correct and legal hourly rate on which increases were based for the entire period covered by this suit.

16. Each of the plaintiffs has received all the regular and overtime wages to which he was entitled over the period covered by this suit.

17. Judgment should be entered for the defendant.

An appropriate order will be filed herewith.