**PEFFER et al. v. FEDERAL CARTRIDGE CORPORATION.**

Civil Actions Nos. 580, 569, 570, 601, 603, 638.

District Court, D. Minnesota, Third Division.

Oct. 6, 1945.

John Edmund Burke and Clifford W. Gardner, both of St. Paul, Minn., for plaintiffs.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., and Bert E. Church, of Kansas City, Mo., for defendant.

NORDBYE, District Judge.

The particular claimants herein involved are six former employees of the defendant whose claims were instituted in their behalf by Lawrence Peffer in the case of Lawrence Peffer et al. v. Federal Cartridge Corporation—Stanley W. Thiele, A. W. Durrin, Irvin P. Erickson, Borg R. Nielson, John Wing, and Warren Dornfeld—and five former employees who brought separate suits against the defendant—Paul J. Tambornino, Eric T. Wick, Anthony M. Fiola, Ray J. Lindquist, and Teddy Webb. These cases have been consolidated for trial.

For the purpose of this proceeding, plaintiffs' counsel have waived their contention that the defendant was engaged in interstate commerce or in the production of goods for commerce prior to March 9, 1942; hence, these plaintiffs have abandoned so much of their claims as are for periods prior to that date. Defendant has agreed that all of the plaintiffs are covered by the Fair Labor Standards Act except Almon W. Durrin and Stanley Thiele. There are presented the following questions:

1. Were the plaintiffs Almon W. Durrin and Stanley Thiele exempt from the overtime provisions of the Fair Labor Standards Act by reason of their being employed in bona fide administrative capacities?

2. Were the remaining plaintiffs employed during the respective periods in question under a contract by which the weekly salaries paid to them were for a maximum of forty hours, or were the weekly salaries which were paid to them intended to compensate them for all hours worked during said periods without maximum limitation?

These questions will be discussed in the above order.

I.

The Federal Cartridge Corporation, and the Federal Cartridge Corporation doing business as Twin Cities Ordnance Plant (hereinafter referred to as the defendant), is a cost-plus-a-fixed-fee contractor with the United States Government for the manufacture of small arms ammunition. These plaintiffs were employed by the defendant in connection with the operation of this ordnance plant located near New Brighton, Minnesota. Durrin and Thiele were classified as administrative assistants. Their

starting salary was $200 per month, but for the greater part of their employment they received $69.60 per week, which totaled over $300 per month. The duties of these two men were substantially the same except for a period of about three months when Durrin was placed in charge of the activities promulgated for the protection of the plant during possible air raids. They both were assistants to one Frank Hubbs, an assistant manager of defendants. In determining whether these two men were employed in a bona fide administrative capacity, reference should be made to the definition promulgated by the Administrator pursuant to the authority granted by the Act. The pertinent portions of the definition follow:

"Administrative. The term 'employee employed in a bona fide * * * administrative * * * capacity' in Section 13 (a) (1) of the act shall mean any employee—

"(A) Who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities). and

"(B) (1) Who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

\* \* \* \* \* \*

"(3) Whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment."

Reference may also be made to the "Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition." Under date of October 24, 1940, it appears that the recommendations made in the report were adopted by the Administrator. This report is helpful in that it tends to explain the reasons which prompted the definition of an administrative employee. For instance, on pages 4 and 5 of the report appears the following discussion of the terms "executive" and "administrative" employees:

"\* \* \* While the usage of the two terms is so vague and so overlapping that there is no generally recognized and precise line of demarcation between them, it does no violence to the common understanding of the words to apply 'executive' to the person who is a boss over men and to apply 'administrative' to the person who establishes or affects or carries out policy but who has little or no authority over the specific actions of other individuals."

Then on page 27 appears certain discussion regarding other considerations which prompted the recommendation of the definition of an administrative employee:

"It will be noted that there are three types of employees included within the proposed exemption (subject to the salary qualification). The first type is the assistant to an executive or administrative employee. In modern industrial practice there has been a steady and increasing use of persons who assist an executive in the performance of his duties without themselves having executive authority. Typical titles of persons in this group are executive assistant to the president, confidential assistant, executive secretary, assistant to the general manager, and administrative assistant. It may be noted that such positions have counterparts in Government service.

"Generally speaking, such assistants are found in large establishments where the official assisted has duties of such scope and which require so much attention that the work of personal scrutiny, correspondence, and interviews must be delegated."

Furthermore, in another part of the report found on page 27 there appear the reasons for providing that the administrative employees must exercise discretion and independent judgment in the performance of their duties, and we are aided in determining what was intended by the inclusion of such requirement by reference to the following:

"\* \* \* However, it is clear that without adequate safeguards the claim could be made that not only the executive secretary but also the special messenger, for example, is an assistant to the general manager. It is, therefore, specified in this subsection of the Regulations that the assistance 'requires the exercise of discretion and independent judgment.' This in itself will assist in drawing a line between the stenographer whose task is primarily mechanical in nature and the true executive secretary who, although she may take some dictation and do some typing, is primarily employed because of her ability to distinguish between callers at the office and to carry out other special and important duties."

The testimony of Durrin and Thiele, as well as other evidence introduced, fully establishes that Mr. Hubbs was employed in an executive or administrative capacity within the meaning of the Act. Mr. Horn, President of the Federal Cartridge Corporation, refers to Mr. Hubbs as one of the "top men" of an organization which at one time had some twenty to twenty-five thousand employees. It is also undisputed that the assistance given Mr. Hubbs by Durrin and Thiele was nonmanual in character. Indeed, there can be no serious dispute that the evidence indisputably establishes, first, that Durrin and Thiele were compensated for their services on a salary basis at a rate of not less than $200 per month, and second, that they regularly and directly assisted an employee (Hubbs) employed in a bona fide executive or administrative capacity, as such terms are used in the regulations promulgated by the Administrator. Therefore, the only factual question which requires any discussion is whether the evidence establishes that the assistance rendered by these two men required the exercise of "discretion and independent judgment." A brief reference to some of the salient facts will indicate that the defendant has convincingly sustained the burden of proof in this regard.

Durrin was fifty-one years of age. He had been connected with the grain business in Minneapolis for many years. In his application for employment, he noted under the heading "List all types of work you have done and prefer to do," the following: "Auditing—Sales Department—Purchasing Department." And under the heading "For what position or kind of work do you apply," he wrote: "Purchase or Sales, Auditing."

Thiele had been manager of the wheat-buying department of one of the large milling companies in Minneapolis for many years. He was forty-four years of age. He had taken a two and one-half year premedic course at the University of Minnesota. In recounting the nature and responsibilities of his prior work, he stated in his employment application: "Executive nature—buying wheat and operating hedge. Giving instructions to wheat buyers and pit traders as to purchasing wheat and trading in futures as dictated by company's need for supplies and position on the market. Conferring with company officers as to policies in buying and hedging. Considerable discretionary powers."

It will be observed, therefore, that both of these men had been employed in responsible positions in the past, and while the administrative work at an ordnance plant differs from the character of work they had performed theretofore, their age and experience fully justified their new employer in classifying them as administrative assistants and clothing them with discretionary powers and duties which required the exercise of independent judgment. They came to the plant before the advent of production. The plant was still in the process of construction. Departments had to be set up and equipment had to be purchased. A temporary office was set up for them on the grounds. During the early period of their employment, Mr. Hubbs remained at the main office of the Federal Cartridge Corporation in Minneapolis. Durrin and Thiele were furnished with a stenographer, and a car which was used in covering the various assignments allotted to them on the rather spacious ordnance plant grounds. Their first duty pertained to the organizing and equipping of certain departments such as the Custodial, Fire Guards, Hospital, First Aid, Identification, Time-keeping, and finally the Commissary. Under Mr. Hubbs' direction, they ordered and expedited the purchase of the necessary material for these departments. Investigation was made as to the most reasonable price for the material to be purchased. The various departments were organized and equipped, and to do this, considerable planning and pioneering had to be done in that this work was new, not only to Durrin and Thiele, but to Mr. Hubbs as well. Undoubtedly, as to major matters, these two men would make their investigation and report, stating their views and recommendations to Mr. Hubbs and obtain his decision. But, it is just as certain that, being on the ground, so to speak, they were required to settle many problems and questions in the exercise of discretion and independent judgment. Common experience will justify no other conclusion. When these men gave their testimony regarding their work at the plant, they evidenced a studied attempt to minimize their responsibilities, and contended that in everything they did they were mere messenger boys, and in plaintiffs' brief it is asserted with reference to the claims of these two men that the defendant herein is endeavoring to "stretch their miniature activities into mountainous efforts." If their

contributions were so miniature as they endeavor to picture, it must follow that they were grossly overpaid. But plain common sense will not permit one to accept their testimony as a correct appraisal of the character of their work. The belittling of their own efforts in attempting to portray the performance of their duties as being devoid of any discretion or the exercise of any independent judgment on their part is so contrary to common knowledge and experience that it deserves but little comment. But one does not need to depend on the rather unconvincing character of their own testimony in determining their status as employees under the Act. The record is replete with affirmative evidence of the nature of the duties assigned to them and the manner in which they were performed. Early in 1942, after the departments referred to above were under way, Durrin and Thiele devoted substantially all of their duties to the Commissary Department. They assisted in buying material, urging upon the vendors the necessity of prompt delivery, expedited deliveries when necessary, and arranged for, supervised, and directed the installation of the various equipment which was installed in the Commissary. Undoubtedly, the primary responsibility for the cafeterias, four in number, and the Commissary Department at the plant was with Mr. Hubbs. He was paid a salary of $92.80 per week. When the cafeterias were in full operation, some sixteen to seventeen thousand employees were fed daily, and there were some forty to fifty food wagons which transported food to designated places in the plant for the convenience of the employees. These cafeterias, however, were not operated by the defendant; they were operated by the Fred Prophet Company. Under the contract, this company was limited to a stipulated maximum profit, and all income over that figure had to be put into the reduction of food prices, etc. After the cafeterias got into operation, Durrin and Thiele were required to make the necessary check of the figures submitted by the Prophet Company as to their operations, so that it could be determined whether the maximum profit had been exceeded. They were required to take inventory from time to time and to pass upon the propriety of various debits and credits which appeared in the company's report. A great deal of checking had to be done by them in order to determine whether or not the Prophet Company was abiding by its contract, and it would be impossible to perform the necessary audit and checking without the exercise of discretion and judgment on their part. Moreover, they were required to take a physical inventory from time to time of the various equipment in the cafeterias and order the replacement of such equipment that might be needed. Complaints about the food and service rendered to the employees by the Prophet Company were handled by Durrin and Thiele. They checked the complaints, determined whether they were well-grounded or otherwise, and made known their views and conclusions to the Prophet Company. It may be fairly stated that, during substantially all of this period, they acted as liaison officers between the defendant company and the Prophet Company. No doubt the major problems were referred to Mr. Hubbs for his decision, but it was Durrin and Thiele who were in active contact with the daily problems which arose. In light of the magnitude of the operations and the multitudinous questions which arose daily, it is nothing short of ridiculous to suggest that they sought Mr. Hubbs' advice with respect to the numerous problems which had to be decided without delay.

Moreover, the correspondence which these men carried on during this period is enlightening as to the responsibilities which they assumed. Stenographic services were available to them at all times. Written instructions were given to the Prophet Company over Durrin's signature regarding improvements in their service, suggestions as to changes which should be made, conclusions as to certain items reflected in the monthly statements furnished by the Prophet Company, written requests to the Prophet Company asking it to make repairs in the cafeterias, and many other similar matters were disposed of by Durrin's own correspondence. In fact, Durrin admitted on the witness stand that Mr. Hubbs clothed him with general authority in carrying on such correspondence, stating to him: "Whatever you write I will stand back of."

As to Thiele, the same general exercise of discretion and independent judgment appears in the written records of the company. True, his correspondence is not as voluminous as that carried on by Durrin, but it does appear that, in substantially the same way, he assumed authority and did clearly reflect the exercise of discretion and independent judgment. Furthermore, the

evidence indicates that Thiele was frequently in conferences with the manager of the cafeterias. He made checks of the receipts and the equipment. Often he spot-checked the merchandise, and checked the invoices and the pay rates of the Prophet Company. He assisted Durrin in checking the Prophet Company reports and adjusted the differences wherever possible. Various problems arising in questions as to the operation of the cafeterias, equipment, repairs, etc., were submitted to Thiele. A large number were handled and determined by him without reference to Mr. Hubbs. It is significant to note that, on May 3, 1943, at which time he was receiving more than $300 per month, Thiele asked for a raise in salary, and in referring to his responsibilities stated: "I am hereby applying for a salary increase based on present duties and responsibilities plus length of service."

Reference may also be made to a letter written by Mr. Hubbs to Mr. Cushman, who was the executive manager of the defendant. Certainly, comment by the immediate superior of these two men, when there was no thought of any dispute or litigation between them and their employer regarding overtime, constitutes most convincing evidence of the nature of the duties performed. This letter was written in April, 1942, and reads:

"Mr. A. W. Durrin whose present salary is $275.00 monthly, has during his employment—the past six months, been very competent, tactful, and loyal in the discharge of the various duties with which this department had to deal. He has worked very closely with me and I have found him the type of assistant with whom one is glad to be associated.

"Mr. S. M. Thiele whose present salary is $250.00 a month, has served practically the same period and in many capacities. At first he was mainly occupied on the area with the Hospital and First Aid but most recently has been supervising our interests in the installation of cafeteria equipment in all buildings, electricity, plumbing, painting, etc., also contact with the vendors.

"In the case of both of these men the early contacts on the area, their judgment and tact in handling matters has resulted in expediting such work as has come to this department. It is my recommendation for consideration that the salaries of these two men be increased to $300.00 per month."

■ Many more incidents and details illustrating the nature of the work of these two men might be recited. The above seems sufficient. Undoubtedly, each case of its kind must be decided on its own merits. The decisions in other cases are not particularly helpful in that it is seldom that two factual situations are the same or even similar. These plaintiffs apparently assume that, merely because the major questions would have to be submitted to Mr. Hubbs for his approval and that the more routine matters were left to their discretion and judgment, they were therefore "mere errand boys" bereft of any responsibility. But instructions regarding repairs in the cafeterias and adjusting complaints regarding food and service, arranging with the carpenter shop at the plant for the supply of additional facilities in the cafeterias, and instructing the cafeteria managers with reference to improved facilities for the convenience of the employees, may not have been problems of such magnitude that they required the consideration and decision of high-bracketed salaried executives, but someone had to decide them and give orders regarding the smaller details which were so highly important in keeping this huge organization running smoothly and reducing dissatisfaction among the employees as to the all-important food question to a minimum. These two men began to work at the plant in October, 1941. Durrin worked there until 1944, Thiele until 1943. No complaints were made, according to their testimony, regarding their failure to receive overtime, except to Mr. Hubbs, who singularly enough is himself a claimant for overtime allowance in this series of suits but who was not called as a witness. That Durrin and Thiele were bona fide administrative employees within the meaning of the Act and the regulations promulgated by the Administrator has been amply demonstrated.

II.

At the outset, it should be made clear that all parties recognize that the remaining plaintiffs are entitled to overtime. True, the defendant did not concede this status until the time of trial. It is evident that, during the employment periods referred to herein, the defendant assumed that these employees were administrative employees, with an exempt status under the Act. All of them earned $200 per month or over. Their services were nonmanual, and generally speaking, they assisted bona

fide executive or administrative employees. It was apparently concluded that their work was of such a nature that some discretion and independent judgment had to be exercised. However, the defendant has now abandoned this claim that these employees were exempt under the Act and the only question before the Court is the amount of the overtime which should be allowed herein. Plaintiffs contend that they had a definite forty-hour workweek contract and that the overtime must be based upon the common divisor of forty into the weekly salary and time and one-half on that hourly basis for all hours over the forty hours worked in any workweek. The defendant asserts, however, that, during the period in question, plaintiffs were not employed on any definite contract for a forty-hour week, but it was intended and understood that the weekly salaries paid compensated them for all hours worked whether less than forty or over forty, and therefore, in computing the hourly rates for the purpose of overtime during any week, the weekly salary would be divided by the number of hours worked in any given week. The defendant, therefore, seeks to apply the formula recognizing the variable workweek, which was adopted in Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. In discussing this formula, the Supreme Court stated (316 U.S. at page 580, 62 S.Ct. at page 1221, 86 L.Ed. 1682):

"No problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates. Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week. As that rate is on an hourly basis, it is regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week, though week by week the regular rate varies with the number of hours worked. It is true that the longer the hours the less the rate and the pay per hour. This is not an argument, however, against this method of determining the regular rate of employment for the week in question. Apart from the Act if there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour. This method of computation has been approved by each circuit court of appeals which has considered such problems. (Citing cases). It is this quotient which is the 'regular rate at which an employee is employed' under contracts of the types described and applied in this paragraph for fixed weekly compensation for hours, certain or variable."

In support of its position, the defendant points out that the Act, section 7(a) (3), provides that overtime must be paid at a rate not less than one and one-half times "the regular rate at which he is employed," and that this requirement has been construed to refer to the hourly rate. Attention is called to Interpretative Bulletin No. 4, issued October 21, 1938, revised December 20, 1939, 1940 Wage-Hour Manual, 95, 96, which reads in part:

"Salaried Employees—General.

\* \* \* \* \* \*

"10. If the employee is on a weekly salary basis, his regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the regular number of hours worked or if no regular number of hours is worked, by the total number of hours worked each week."

Section 516.4 of the Rules and Regulations, Keeping of Records, issued by the Wage and Hour Division, 1940 Wage-Hour Manual 282, under the heading of "Definition of Terms Used in These Regulations," reads:

"(f) Regular Rate of Pay.—For the purpose of these regulations the term 'regular rate of pay' means—

"(1) with respect to an employee paid solely on an hourly basis (i. e., receiving no additional wage whatsoever):—the hourly wage rate at which he is employed.

"(2) with respect to an employee employed on a daily, weekly, semi-monthly or monthly basis for a regular number of hours per week determined by agreement or custom:—the average hourly rate obtained by dividing the wages earned for that regular number of hours; and

"(3) with respect to an employee paid on any other basis than those specified in (1) and (2) of this Paragraph (f):—the average hourly rate obtained by dividing the wages earned for the particular workweek by the total number of hours worked during that workweek."

The defendant concludes, therefore, that, unless the evidence justifies a finding of an

agreed hourly rate or a regular number of hours determined by agreement, understanding, or custom, the rate of these particular plaintiffs must be determined under Section 3 of the above definitions, which provides that, in absence of a factual basis for computation under Sections 1 and 2, the hourly rate must be ascertained by dividing the wages earned during any particular week by the total number of hours worked during that workweek.· The determination of the soundness of the respective positions taken by the parties herein must, of course, depend upon a fair appraisal of the facts. Some general observations may first be noted.

The Twin Cities Ordnance Plant began to hire employees in the fall of 1941 when the plant was still under construction. When the plant began operation in the spring of 1942, the employer was producing goods for interstate commerce and the Fair Labor Standards Act applied to all of the employees except those who were exempt from the Act. Notices as to the application of the Walsh-Healey Act, 41 U.S.C.A. § 35 et seq., and the Fair Labor Standards Act were posted throughout the factory buildings in conspicuous places, and manuals for the guidance of the employees were published by the defendant and distributed to all the employees. The hours of work were noted in the manual issued April 15, 1942, as follows:

"D. Hours of Work. Hours of work are at the regular schedule of forty (40) hours per week. Workers in certain classifications will be allowed overtime which will be paid on the basis of one and one-half the regular per hour rate for any required and authorized overtime work. It should be noted that this procedure is based on existing laws. An Act of Congress, therefore, may necessitate its revision."

And in the issue of June 1, 1943, as follows:

"D. Hours of Work. 1. Hours of work are at the regular schedule of forty hours per payroll week. For authorized and required hours in excess of forty in any payroll week, or in excess of eight in any day, payment will be made pursuant to the provisions of the Wage-Hour and the Walsh-Healey Acts, on the basis of one and one-half times the regular per hour rate, or such other rate as may be established by law or by the President's directive, provided the position is not exempt under the Wage-Hour Act or the Walsh-Healey Act."

As the manual of June 1, 1943, indicates, the employees were apprised of the exemption that exists under both Acts. The manual of April 15, 1942, states that workers in certain classifications will be allowed overtime. It may be noted that each manual contains a paragraph in which the company reserves the right to add to or amend its provisions. All of the nine plaintiffs whose cases are now being considered began to work on an overtime basis except Teddy Webb and John Wing. Webb was employed in the beginning on the basis of $75 per week as investigator of sabotage and subversive activities, and was transferred to the Twin Cities Ordnance payroll from the payroll of the prime contractor which erected the ·Twin Cities Ordnance Plant. Webb had been employed with the contractor doing substantially the same work and receiving substantially the same salary with no overtime allowed for hours over forty. When he was placed on the Twin Cities payroll, the same arrangement was continued. Wing did not begin to work for the Twin Cities Ordnance until November, 1942, and at that time the company policy regarding employees who were paid a straight weekly salary regardless of the number of hours worked and which aggregated over $200 per month and therefore were considered to be on an exempt basis under the Fair Labor Standards Act, had already been made effective. Wing was assigned to the so-called Foremanship Training School at $58.40 per week and was placed on a nonovertime basis. In the beginning of their ·employment, the other seven plaintiffs apparently worked on a forty-hour week basis with time and one-half for hours over forty. Undoubtedly, some confusion existed in the early stages of the operations regarding the interpretation of the Fair Labor Standards Act, but in June, 1942, the Rating Committee of the defendant, which had sole control over salaries, overtime, and the classification of employees, concluded that every administrative employee paid a weekly salary aggregating $200 a month or over and doing nonmanual administrative work was exempt under the Fair Labor Standards Act. As the result of this policy, a statement was issued as being approved by the then Commanding Officer, Captain J. S. Hudgens, on August 25, 1942. This statement was apparently circulated among the supervisors and Division Heads—not generally among the employees. It reads in part as follows (Plaintiffs' Exhibit 120):

"It is the policy of Federal Cartridge Corporation to grant certain privileges to employees who are exempt under the Wage-Hour Act or the Walsh-Healey Act, and not entitled to receive overtime pay.

"In general, all employees of Twin Cities Ordnance Plant, Federal Cartridge Corporation, who are exempt and not entitled to receive pay for overtime under the Wage-Hour Act or the Walsh-Healey Act, are required to work not less than forty hours each week. Furthermore, as a matter of practice and plant necessity, these employees, on occasions, are expected to and do work or perform services more than forty hours each week and do so without extra or overtime pay.

"Because such employees are not entitled to extra pay for the extra hours of work customarily and regularly required of and performed by them, no deduction from their regular weekly pay will be made if, upon occasion, and for good and sufficient reason, approved by their Superior or Division Head, they work less than forty hours in any week. The fact that such an employee may work overtime in any week shall not entitle him to work a correspondingly less number of hours in any subsequent week."

There were other considerations granted the so-called weekly salaried nonovertime employees. For instance, there was no deduction for holidays which were not worked and certain sick leave privileges were granted. Therefore, in conformity with this policy when these plaintiffs were placed on a weekly salary of $46.40 or over per week, they were transferred from an overtime to a nonovertime basis. That they knew that they were not receiving overtime is, of course, apparent. Their checks were the same whether they worked less than forty hours or over forty hours. Their checks were the same whether the hours were forty, forty-six, or fifty, or any other number of hours. Certainly, it is clear that the company intended to pay them a straight weekly salary regardless of the number of hours worked during any given week. True, the defendant assumed that these employees were all on a nonovertime basis, but its assumption in this regard was not entirely unwarranted. They were at least all employed in connection with administrative or executive departments; their work was nonmanual in nature and they all received over $200 per month. However misinformed the company may have been as to the interpretation of the Act, they did follow a consistent policy in this regard, which provided for the employment of each assumed nonovertime employee for a workweek of unlimited hours. It appearing that the company intended that these men should receive a straight salary per week regardless of the number of hours worked, there seems but little doubt that these employees understood and accepted this arrangement, and in light of all the circumstances, adopted the arrangement of a variable workweek at a straight weekly salary.

All of these plaintiffs continued to work for appreciable periods of time at fluctuating hours per week on a straight weekly salary basis. In this regard, it is helpful to consider in some detail the records of the individual plaintiffs as to the time which they worked on an overtime basis and on a nonovertime basis, and the variable or fluctuating number of hours which their time records reflect when they were on such nonovertime basis. If the arrangements reflected by the following records were not satisfactory to them, they could have discontinued their employment, which, of course, was at will. Instead, they continued to work, to receive the same checks for variable workweeks month after month, and accepted raises and promotions and the considerations which were accorded to employees who were on a fixed weekly salary without maximum hour limitations. It is quite apparent that these men were paid so much money to do a particular job regardless of the time it took.

Warren Dornfeld began to work in March, 1942, in the Tabulation Department. He received overtime from April, 1942, to May 30, 1942. He was then told by Mr. Strand, his immediate superior, that his salary was raised to $56 per week and that he would get no further overtime, and upon being asked why, Strand replied that it was company policy. Dornfeld worked from June 6, 1942, to April 3, 1943, on a nonovertime basis. His weekly hours during this time varied from a low of 40 to a high of 63.8. During the period referred to, he was absent for some few months; that is, he resigned on July 18, 1942, and returned on November 5, 1942. When he returned he was sent to a new department and received $52.80 per week with no overtime. His salary was raised to $58.40 per week on February 13, 1943, which continued until April 3, 1943.

Eric T. Wick started as a fire fighter, then was promoted to Lieutenant and then Captain of the Fire Department. He began to work as a fire fighter on September 15, 1941, at 70 cents per hour with time and one-half for overtime over forty hours a week. Later, he was raised to 88 cents per hour. As of August 21, 1942, he received a notice of change by the Rating Committee to the effect that his salary was to be $52.80 per week, beginning September 4, 1942. His overtime was then discontinued. He was paid a straight weekly salary from September 4, 1942, to March 20, 1943, and during that period his hours per week ranged from 40 to 49.2. He complained about not receiving any overtime and received a raise to $58.40 per week, which was made retroactively from November, 1942, to March, 1943.

John Wing began to work on November 20, 1942. He was classified as a director and was assigned to the Foremanship Training School. His salary was $58.40 per week and he continued to work on a straight weekly salary, with no overtime until February 26, 1944, when he terminated his employment. Some weeks he worked less than 40 hours and received his full check without deduction. Generally speaking, his hours per week ranged during that period from 32 to 52.

Ray J. Lindquist was employed as an expeditor on an overtime basis. He was paid overtime from January 26, 1942, to April, 1942, for all hours over 40 per week. Then he was placed on a $58.40 per week basis without overtime, and was told that that was his classification. He worked on that basis until August, 1942. During that period, his hours per week ranged from 42.5 to 65.9. In August, 1942, he was transferred to the Tool Inspection Department and then was reclassified and placed on an hourly basis at $1.20 per hour. He received overtime for all hours over 40 per week from August, 1942, to October 1942. In October, 1942, however, he was transferred to the Tool Mortality Department and then was replaced on a weekly salary of $58.40 with no overtime. On this non-overtime basis he worked at $58.40 per week from October, 1942, to February. 26, 1944, with hours per week ranging from 33.8 to 58.4.

Irvin P. Erickson began to work for the company in April, 1942, at an hourly wage as a clerk in the Roads and Grounds Department. He received time and one-half for all hours over 40 per week. This hourly arrangement with overtime continued until December, 1942. His pay was then raised to $52.80 per week and he became what was designated as Clerk No. 4. There was a notation of no-overtime on the notice of pay change. Later, he was raised to $58.40 per week. He was on a nonovertime basis from December 12, 1942, until the first of January, 1944. His weekly hours during this period ranged from 30.2 to 54.4.

Paul J. Tambornino began to work for the company as an expeditor on February 10, 1942. He received time and one-half for all hours over 40. He was paid overtime until April 1, 1942, when he was notified that no further overtime would be allowed because of an increase in salary and at that time he was paid $58.40 per week. On May 1, 1943, his salary was increased to $69.60 per week. From April 4, 1942, until October 23, 1943, when he terminated his employment, he was on a nonovertime basis and his weekly hours varied from 31.9 to 73.

Teddy Webb, as heretofore stated, was employed as an investigator. He was paid $75.20 per week in the beginning of his employment. He was never on an overtime basis. From March 28, 1942, to December 12, 1942, his weekly hours varied from 40.9 to 64.9. He resigned on December 12th and was rehired on December 19, 1942, as a clerk, and then received an hourly wage of $1.02 and then was placed on an overtime basis.

Borg R. Nielson began to work as a draftsman in May, 1942, at $35.20 per week. He was paid overtime from May, 1942, to September 20, 1942, and then he was raised to $52.80 per week and was reclassified as Engineer No. 2 with no overtime. He stated he knew that, under such classification, he would receive a straight salary without overtime. Later, his salary was raised to $58.40 per week. He terminated his employment on September 10, 1943. From September 20, 1942, to September 10, 1943, when he was on a nonovertime basis and received a straight weekly salary, his hours per week varied from 32 to 48.6.

Anthony M. Fiola began to work as an investigator at 70 cents per hour and received overtime for all hours over 40. His work commenced in March, 1942. He was paid overtime from March, 1942, until April 26, 1942. Then his salary was in-

creased to $52.40 per week with no overtime. On March 13, 1943, his salary was raised to $64 per week. He terminated his employment on the 10th of September, 1943, and during the nonovertime period his weekly hours varied from 32.3 to 75.4. At least one of the raises was granted him because he complained to his immediate superior about no overtime being allowed, and this superior recommended that his weekly salary be increased, which was done. .

While the company's policy during this period was to require the salaried nonovertime employees to work a minimum of forty hours in order to be entitled to the stipulated weekly salary, no deduction was made, if on occasion, through intervention of holidays, sickness, or other understandable circumstances, a full week of forty hours was not registered on the time clock. At one time there was a dockage made where certain weekly salaried employees on a nonovertime basis did not work the minimum of forty hours, but all such dockages were restored to the employees in August, 1943, long before the commencement of this lawsuit. Thus, under the practice as adopted by the defendants, while the minimum workweek was forty hours, plaintiffs received a full weekly check whether the hours were above or below forty hours per week. The only exception was when such employee began to work or quit work of his own accord in the middle of or during the week.

The situation disclosed by the evidence does indicate that, in some instances, these employees were told by their immediate superiors when they began their employment with the Twin Cities Ordnance that they were to be hired on a forty-hour per week basis with overtime at time and one-half for all hours over forty. But after their new classification or salary raise, any contract hours were not the actual hours worked, and the basis for any reliance on such statements which may have been made when the men were first employed, or any reliance on the manuals, was entirely removed when the men must have known and understood that, by reason of salary raises or their reclassification, the company policy was being put into effect so that they would be paid a straight weekly salary regardless of the number of hours worked and as nonovertime employees would be entitled to the considerations accorded to this class, who were deemed exempt under the Act. That these plaintiffs may have complained to their immediate superiors about the policy of no overtime is entirely probable. But that they knew and understood that they were no longer hired and paid on the basis of a maximum forty-hour week is even more probable. For weeks and months, they continued to receive the same weekly salary regardless of the number of hours worked. The evidence is barren of any promise or statement, or even suggestion from any authorized superior which would justify them in assuming that, after they were placed on a nonovertime basis, they were on a forty-hour week contract. While some of these superiors to whom complaints were allegedly made may have held out the hope that overtime adjustments would eventually be made, they understood that they were without authority to change the classification or salary arrangements of these plaintiffs. This was evident from the character of the conversations which were allegedly had with the employees in question, and they were evidently in recognition of the notices which were sent to all Division Heads on April 17, 1942, by Mr. Ehlen, the General Manager, wherein he stated (Defendant's Exhibit 102):

"After considerable time and study, the Rating Committee has put into effect certain classification titles and salaries for various types and kinds of work on the Plant Site.

"Under no conditions are any of these title classifications and/or salaries to be changed without the approval of the Rating Committee.

"This information is to be brought to the attention of all persons in your Division who have the authority to requisition help or recommend salary adjustments."

And again on March 29, 1943 Mr. Ehlen wrote to all department heads, building superintendents, and personnel representatives as follows (Defendant's Exhibit 105):

" * * * Supervisory personnel shall in no instance notify or in any manner promise or indicate to any individual that he or she will receive a wage adjustment. The Rating Committee, not the supervisory personnel, determines whether a wage or salary adjustment will be made, and in many instances, the Rating Committee must first obtain approval from the War Department Wage Administration Agency. The United States Government has set up certain rules and regulations with refer-

ence to wage and salary adjustments and the procedure therefor, and these must be complied with. The supervisory personnel are therefore definitely instructed to make clear to employees that any action and/or words on the part of supervisory personnel constitute a recommendation only. This is highly important, and it is expected that you will constantly keep this fact in mind."

These plaintiffs understood that the Rating Committee alone had authority to change title, classifications, and salaries. They knew that the company considered them as exempt employees. If their position is to be sustained, it would follow that, week after week, and in most instances for many months extending over a year, they were working without receiving any pay, either straight or overtime, for the hours in excess of forty. It is quite impossible to believe that they considered that they were working under such an arrangement. Because if it is true that the weekly salary merely paid them for forty hours, it must follow that they were not receiving any pay, either straight or overtime, for the hours which exceeded that number, and during the periods in question, the time sheets reflect that, during a large majority of the weeks, their hours were well over forty, which they well knew.

The emphasis which the plaintiffs now place on the complaints and general discussion and rumours which circulated around the plant regarding overtime and their contention that they believed some adjustment would be made regarding overtime, does not necessarily indicate an understanding on their part that they assumed that they were working on an hourly basis computed by dividing their weekly wages by forty and time and one-half at that rate for the hours over forty. Their complaints and alleged reliance on rumours and statements of unauthorized persons are just as consistent with defendant's theory that the hourly wage was, as it contends, a weekly salary, regardless of the number of hours worked. It seems clear that the placing of these men on an exempt basis with no overtime was the real cause of the claimed dissatisfaction, and the basis for the alleged complaints, not the method of computing overtime. In fact, all the alleged complaints referred to their failure to be accorded overtime.

The contention that these plaintiffs relied on the manuals and notices posted by the company regarding the forty-hour work-week, and therefore such references should be considered as corroborative of the contract which they urge, is not particularly persuasive. The manuals indicated that the overtime provisions were not applicable to exempt employees and these plaintiffs knew that they were classed as exempt employees. By reason of that very knowledge and the fact that they were placed on a variable workweek, with a stipulated weekly salary with no overtime, must have informed them that the forty-hour workweek referred to in the manuals, etc., did not apply to them. Furthermore, these manuals do not state that all employees were on a forty-hour maximum workweek. As stated by Judge Joyce in Anderson et al. v. Federal Cartridge Corporation, D.C., 62 F.Supp. 775, 780, where he was confronted with substantially the same question under substantially the same circumstances, in commenting upon the contention of counsel in that case that if the employees involved had not relied on the manual " 'they would have quit the plant instanter' ":

" * * * There is no support in the evidence for such conclusion and the contention that these booklets, which cover a wide variety of informative material, constituted a contract of employment between defendant and these plaintiffs, in my opinion is unsound. It is specifically stated in the booklet that the forty hour week and overtime provisions do not apply to exempt employees. There is no serious question but that all of these plaintiffs were considered to be exempt by the defendant. Plaintiffs' own actions during their term of employment disclose clearly what the contract was. When each was promoted to the straight salary classification he was given a definite job to do with supervisory duties and without particular reference to hours. All plaintiffs worked varying times from less than forty to more than sixty hours in a workweek, although the standard for non-exempt employees was usually forty-eight hours. Each week they received the same salary without complaint or any indication that such was not their agreement with the company. That they later became dissatisfied with the arrangement in no way changes its nature."

While the evidence herein may indicate complaints with respect to the failure of these plaintiffs to receive overtime, no person in authority ever led these plaintiffs to believe that they were working on any other basis than that which the undisputed facts indicate.

Plaintiffs rely on other incidents to support their theory of a forty-hour week contract. They refer to the notice posted as of August 5, 1942, regarding vacations. If an employee had worked for a year, he was entitled to a week's vacation with pay. On account of war conditions, many employees could not be spared from their work, and it was ordered in the notice that such employees should receive "a sum equal to pay for one forty-hour week computed at the then basic rate of pay of such employee for a forty-hour week." This notice evidently applied to all employees entitled to a vacation and who were not able to be spared from their work. It would seem, however, that a general notice of this kind does not impair the defendant's contention that these plaintiffs were employed on a variable workweek basis. It may be reiterated that the standard workweek at the plant was forty hours and overtime employees received time and one-half for all hours over that number. Nonovertime employees, subject to certain exceptions, were supposed to work a minimum of forty hours in order to be entitled to a full week's pay. In determining, therefore, the amount of pay the vacationless employee should receive, the forty-hour workweek basis logically was the appropriate time period for all of such employees upon which vacation time pay should be computed.

Reference is also made to this circumstance: When a weekly salaried employee went to work in the middle of the week, for instance, and his time records showed less than forty hours for that part of a week, he was not paid his full week's salary but it was computed on a forty-hour week basis and he received a salary equal to the proportionate part of a forty-hour week which he worked. However, this practice is entirely consistent with the policy of the company that the weekly paid employees were supposed to work a minimum of forty hours subject to certain exceptions when holidays and sickness intervened. Therefore, when one was employed on a variable workweek basis, and began to work in the middle or during the week, or quit of his own accord during the week, some common denominator had to be used in order to determine the fair wage for that part of the workweek. In that the weekly employees were expected to put in at least forty hours in order to draw the stipulated salary, it is entirely understandable why the company followed the policy of using forty as a divisor in determining the salary to which the particular employee was entitled for the number of days that he had worked in such week. Smith v. Porter, 8 Cir., 143 F.2d 292.

Plaintiffs place much emphasis on the so-called Omaha Code. It is contended that this document irrefutably establishes that the workweek of these plaintiffs, as well as of other weekly salaried employees, was a forty-hour workweek, and that the overtime is to be computed by using forty as a divisor into the weekly salary. It appears that the payroll of the defendant was forwarded to the Ordnance Finance Officer at Omaha, Nebraska, for auditing. During the early days of the operation, some difficulty apparently arose in connection with the audit, in that, although different employees carried the same title, the rate of pay for such employees was not the same. This situation caused the preparation of a list of all job titles, with the maximum and minimum pay noted for each title. Employees on a weekly rate and an hourly rate were listed with the maximum and minimum rate as to each and the number of employees employed under such title. The weekly rate, maximum and minimum, as to all of such employees was broken down into the hourly rate, maximum and minimum. As to the weekly employees, the hourly rate was obtained by dividing the weekly rate by forty. Plaintiffs rely on this document as strong evidence that all of the employees were on a forty-hour week basis. But the fallacy of plaintiffs' position seems evident when several factors and circumstances are considered. First, it should be noted that the Omaha Code was not a wage and salary roll and was not used for that purpose. It was drawn up in order to aid the auditor by listing the maximum and minimum rates of pay and this document was used for no other purpose and had no general circulation. The executives who prepared the list testified that, although it was appropriate to show the maximum and minimum hourly rate for overtime employees, for no particular purpose the hourly rate was extended to include all weekly salaried employees up to the assistant to the General Manager and the Division Manager. The executives who prepared the Code testified that the hourly wage breakdown for nonovertime employees had no significance. They point out that many nonovertime employees were employed at weekly rates between the minimum and maximum so that the breakdown would not even aid the auditor in auditing the salaries

paid for part of a week when the forty-hour minimum workweek was deemed applicable to weekly employees. They could assign no particular reason for the breakdown into hourly rates of the weekly paid employees except that it was extended at the same time that the hourly rates were set forth for the overtime employees. But whatever the purpose may have been, or whatever convenience such data may have afforded the auditors in Omaha, it does not appear that any of these employees had access to the Code or that they relied on any of the information contained therein. Moreover, it is evident that there was no intention to put the assistant to the General Manager, for instance, who was drawing a salary of $139.20 minimum to $144.-80 maximum per week, on an overtime basis or on a forty-hour week contract. Clearly, he was exempt from the provisions of the Fair Labor Standards Act and at no time received any overtime. Likewise, the breakdown into hourly rates of the weekly salary, minimum and maximum, of the Division Manager and superintendents was in no way indicative that they were on an overtime basis or were working on a forty-hour week contract. If plaintiffs' contention is correct that the Omaha Code is determinative of the rights of the employees to overtime and to a forty-hour week basis, then every employee of the company, from the General Manager's assistant down, was on a forty-hour week basis with time and one-half for all hours over forty. Again, it should be noted that the Omaha Code was not a wage and salary roll. No hourly rate was shown on the company's payroll record for the weekly salaried nonovertime employees. The deductions which plaintiffs assume to make from the existence of the Omaha Code are entirely inconsistent with Plaintiffs' Exhibit 120, heretofore referred to, which specifically states certain policies of the company regarding exempt employees and sets forth that they were required to work more than forty hours without extra pay. That is the policy that the Rating Committee adopted and followed in determining the classifications and salary of these plaintiffs. The weight of the evidence negatives any support for the deductions which plaintiffs assume to draw from the existence of the Omaha Code, and a fair appraisal of the facts would seem to require a finding that they understood and by their conduct acquiesced in the arrangement which the company adopted with reference to the policy of a straight weekly salary regardless of the number of hours worked per week.

Plaintiffs refer to Section 4126-11 et seq., Mason's Minnesota Statutes Supp.1940, which requires the employer to give an employee a written and signed agreement of hire where a contract of employment is consummated between such employer and employee for work to be performed in this State. The statute provides that this agreement must set forth, among other things:

"The number of hours a day which shall constitute a regular day's work, and whether or not additional hours the employe is required to work shall constitute overtime and be paid for, and if so, the rate of pay for overtime work."

The statute provides further that:

"Where no such written agreement is entered into, the burden of proof shall be upon the employer to establish the terms of the verbal agreement in case of a dispute with the employe as to its terms." Section 4126-12.

■ The "notice to work" form which some of these plaintiffs received probably sets forth sufficient information to comply with the statute. Then, again, the notice of change which some of these plaintiffs received notified them that they were being placed on a nonovertime basis by reason of raises in salary. But it must be recognized, at least, that as to some of these plaintiffs, defendant did not comply with this statute. However, if applicable, a consideration of all the facts and circumstances convinces this Court that as to all these plaintiffs, the defendant has fairly sustained the burden which this statute assumes to impose.

■ There can be no serious question that the company was free to classify its employees in any manner which did not conflict with the provisions of the Fair Labor Standards Act. All these plaintiffs received wages far in excess of the minimum required by the Act. Here, we have no subterfuge or evasive schemes which were directed to defeat and contravene the evident purposes of the Act, such as the Supreme Court considered in Walling v. Youngerman-Reynolds Hardwood Company, 325 U.S. 419, 65 S.Ct. 1242, 1250, and Walling v. Harnischfeger Corporation, 325 U.S. 427, 65 S.Ct. 1246, 1250. The defendant was clearly within its rights when it determined that certain employees whom it honestly assumed to be exempt from the

Act should be paid a weekly wage for a variable workweek, and as long as that arrangement did not conflict with the minimum wage provisions of the Act, such arrangement was not denied to it, granted, of course, that overtime must be paid on the variable workweek basis. Plaintiffs earnestly contend that there was no meeting of the minds with reference to the type of contract which the defendant now urges. But a contract can be entered into by means other than in writing or by an exchange of oral covenants. It is inconceivable that these men could have worked during the many weeks and months of their employment without fully appreciating and understanding that the same weekly check was full compensation for the fluctuating hours that were worked. That their consent to such an arrangement as the company adopted and applied may be manifested by their continuing to work has convincing support in Williams v. Jacksonville Terminal Co., 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914, and Shepler v. Crucible Fuel Co., 3 Cir., 140 F.2d 371.

The erroneous assumption of the company that these plaintiffs were exempt from the Act does not militate against its position that they were employed on a straight weekly salary regardless of the number of hours worked. Rather, it tends to sustain the reasonableness of defendant's contention that, as assumed exempted employees, they were being employed on that basis. Such an arrangement is entirely consistent with their assumed exempt status. The fact that fluctuating or variable workweeks were not specifically referred to in any of the notices of the company is of no consequence. The fact remains that the very circumstances themselves characterize the employment of these plaintiffs as being on the basis of a weekly salary for a fluctuating workweek. There is no provision in the Act which suggests that the hourly wage of weekly employees must be determined by using forty hours as the divisor. When these plaintiffs asked for and received raises during these periods, they knew they were not accorded a raise on a forty-hour week basis, but rather on the fluctuating workweek basis, on which their employment was based. The only way to reduce their wage increases to an hourly increase would be to divide the raised weekly salary by the number of hours worked.

The situation herein cannot be rationally distinguished from that which confronted the Circuit Court of Appeals for this Circuit in Landreth v. Ford, Bacon & Davis, Inc., 147 F.2d 446. There, as here, the company announced in various ways its intention to comply with the Fair Labor Standards Act and the Walsh-Healey Act. There, as here, the company was engaged under a contract with the United States in the operation of a plant producing munitions. There, as here, the company erroneously assumed that certain alleged supervisory employees were exempt from the Act. Those in the assumed exempt classification were paid " 'a certain amount to do certain jobs, whether it took 40 hours or 44 hours or 48 hours, so much money to do that particular job regardless of time.' " 147 F.2d at page 447. The court held that, while the company erred in its interpretation of the Act, it did adopt a wage policy which provided for a workweek of unlimited hours for the employees in the classifications set forth to be exempt. It noted that the Fair Labor Standards Act does not limit an employee to forty hours, and stated (147 F.2d at page 448):

" * * * On the contrary, it expressly permits employment for a workweek in excess of forty hours on condition that the employee receive compensation for time over forty hours at one and one-half times the regular rate at which he is employed."

The court there adopted the formula as set forth in the Missel case, dividing the weekly wage by the number of hours worked in any particular week in order to determine the regular rate at which the employees were employed. And regarding the admission of the employer that it had erroneously classified the plaintiff as an exempt employee under the Act, stated (pages 448, 449 of 147 F.2d):

"On the trial in the district court the appellee admitted that it was mistaken in its belief that appellant, although employed and classified as a supervisory employee, was not entitled to the overtime compensation required by the Fair Labor Standards Act for hours in excess of forty in any workweek. But this admission on the part of appellee can not be stretched to include the further admission that the appellant was employed by appellee for a workweek of only forty hours."

The same formula as approved in the Missel and Landreth cases should be adopted and applied in determining the amount of overtime to which these nine employees are entitled. While the application of this formula will not result in the

amount of overtime which these plaintiffs are claiming herein, the respective amounts to be allocated to them will afford to them all the rights under the Fair Labor Standards Act which a fair and reasonable appraisal of the evidence will justify. These plaintiffs have failed to show that, during the periods in question, there was an agreement that their salaries were for a maximum of forty hours a week, and defendant has fairly established, in light of all the evidence, that their weekly salaries were intended to compensate them for all hours worked during the periods in question without maximum limitation, which arrangement became the working contract between the parties. It follows, therefore, that in determining their "regular rate" for the purpose of computing overtime, their weekly salary must be divided by the number of actual hours worked during any given week during the periods in question.

The defendant may present findings of fact and conclusions of law in harmony with the views indicated herein upon five days' notice, and at the time proposed findings of fact, conclusions of law and order for judgment are presented, the Court will consider the question of liquidated damages, attorneys' fees, and costs to be allowed to the plaintiffs.

An exception is reserved to each plaintiff herein.